FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

C5 JAN 19  AM 10: 38

| | |
|---|---|
| The United States Of America,<br>ex rel., **Joe Liotine**, individually,<br><br>     Plaintiff,<br><br>     v.<br><br>**CDW-Government, Inc.**<br>An Illinois corporation.,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 05-33 DRH

**FILED IN CAMERA AND
UNDER SEAL**

**JURY DEMAND**

## FALSE CLAIMS COMPLAINT WITH JURY DEMAND

### COUNT I

### False Claims Act 31 U.S.C. §3729(a)(1) & (2)

NOW COMES the Plaintiff, the United States of America, by the Relator, Joe Liotine, through his attorney, Dale J. Aschemann of Aschemann Keller LLC and for Count I of its Complaint against CDW-Government, Inc. (hereafter "CDW-G" or "Defendant") alleges as follows:

    1.    This is an action for damages and civil penalties on behalf of the United States of America arising from false statements and records made or caused to be made by Defendant to the United States in violation of the False Claims Act, 31 U.S.C. § 3729, et seq., as amended (hereafter "FCA"). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730 (b).

    2.    Defendant is an Illinois corporation with its principal place of business in Illinois.

    3.    Defendant is a wholly-owned subsidiary of CDW Corporation, Inc., an Illinois corporation formerly known as CDW Computer Centers, Inc.

1

4.     Defendant contracts with the United States of America (hereafter "Government") through the General Services Administration (GSA) as a reseller of information technology, equipment, services, and products. The Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732 (a).

5.     Venue is proper in this District pursuant to 31 U.S.C. § 3732 (a) because Defendant can be found in, resides in, transacts or has transacted business in the Southern District of Illinois.

6.     Relator, Joe Liotine ("Relator"), is a citizen of the United States and a resident of the States of Illinois.

7.     From March 20, 1997 to July 7, 2001, Relator was employed by Defendant as a customer service representative, shipper, and later as a sales representative in Defendant's federal sales unit with responsibilities for sales to the Treasury Department including the IRS, Customs, the Mint, Alcohol Tobacco and Firearms, the Bureau of Public Debt, virtually every bureau under the Treasury Department as well as the Central Intelligence Agency.

8.     As a sales representative, Relator received and filled purchase orders/requests from federal agency procurement offices, procurement officers, or regular government offices on behalf of Defendant.

9.     Relator alleges that all of the matters and fraudulent conduct alleged in this Complaint are not limited to himself and his immediate supervisors but rather a pattern and practice of conduct followed by virtually all government sales reps employed by Defendant.

10.     Relator is the original sources of the allegations as defined in 31 U.S.C. § 3730 (e)(4)(B). Relator has knowledge of the false statements and/or claims that Defendant submitted, or caused to be submitted, to the Government as alleged herein.

2

11.     Relator brings this action for violations of the FCA on behalf of himself and the United States of America pursuant to 31 U.S.C. § 3730 (b)(1).

12.     To the extent, if any, that this case is deemed to be a related action and that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* FCA action pending at the time of filing of this action, as prohibited in 31 U.S.C. § 3730(e)(3), said factual allegations in common with either pending action, which would cause this to be a related cause of action, are hereby expressly excluded from this action, but only to the limited extent necessary to exclude such preemption.

13.     Furthermore, to the extent that the court finds that the allegations or transactions set forth herein are based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, then the allegations or transactions referred to herein that the court deems are based upon allegations or transactions which are the subject of any such civil suit or administrative civil money penalty proceeding are expressly excluded, but only for the specific time periods, specific companies, and specific allegations or transactions as necessary.

14.     The General Services Administration (GSA) awards and administers the Federal Supply Schedules Program ("FSS Program") pursuant to section 201 of the Federal Property and Administrative Services Act of 1949. Under this program, GSA enters into government-wide contracts with commercial firms to provide commercial products and services, at stated prices, for given periods of time. Federal agencies place orders directly with the contractor, referred to as a "Schedule contractor", and deliveries are made directly to the customer.

15.     The GSA Schedule program is designed to provide government customers with commercial services and products at volume discount pricing on a direct-delivery basis.

3

16.    GSA Schedules offer the potential benefits of shorter lead-times, lower administrative costs, and reduced inventories, including significant opportunities for agencies to meet small business goals, while promoting compliance with various environmental and socioeconomic laws and regulations.

17.    There are two parts to the FSS Program, Single Award Schedules and Multiple Award Schedules.

18.    Single Award Schedules are made with one supplier for a specific product at a stated price for delivery to a geographical area, defined in the Schedule.

19.    Under the Multiple Award Schedules ("MAS") Program, GSA awards contracts to multiple companies supplying comparable services and products, at varying prices.

20.    GSA will award MAS contracts to all companies that offer a commercial item falling within the generic description of the Schedule, provided that prices are determined fair and reasonable and commonly known as "most favored customer" pricing.

21.    Government contracting officers determine that prices are fair and reasonable by comparing the price or discounts that a company offers the government, with the price or discounts that the company offers to its own commercial customers. In order to make this comparison, MAS solicitations request offerors to disclose information about their commercial pricing policies and practices.

22.    When orders are placed against a GSA Multiple Award Schedule (MAS) contract, using the procedures under Federal Acquisition Regulation (FAR) 8.4, they are considered to be issued using full and open competition (see FAR 6.102(d)(3)). Ordering offices need not seek further competition, synopsize the requirement, make a separate determination of fair and reasonable pricing, or consider small business programs.

4

23.     By placing an order against a GSA Schedule contract, the ordering office has concluded, based on the contractor's representations, that the order represents the best value and results in the lowest overall cost alternative (considering price, special features, administrative costs, etc.) to meet the government's needs.

24.     GSA Schedules are a nonmandatory source of supplies and services that provide indefinite delivery, and indefinite quantity contracts (IDIQ). The government is obligated only for the guaranteed contract minimum and the contractor is obligated to accept orders up to the maximum order threshold. The guaranteed minimum covers the entire period of contract performance.

25.     As of October of 1994, a revised Price Reduction clause was introduced into all Federal Supply Schedule contracts which allows a Schedule contractor to give one federal customer a discount without passing the discount on to the entire federal government. This provision, in essence, allows the contractor to offer, and the government to avail itself of, spot pricing in the commercial market.

26.     MAS Contractors may add and delete products and services from their contracts as their commercial product lines evolve. This allows contractors to continually refresh technology offered through the Schedules Program.

27.     Blanket Purchase Agreements (BPAs) are a simplified method of filling anticipated repetitive needs for services and products and are little more than "charge accounts" that ordering offices establish with GSA Schedule contractors to provide themselves with an easy ordering tool.

28.     In accordance with Federal Acquisition Regulation (FAR) 8.404, ordering offices may establish BPAs under any GSA Schedule contract and an ordering office may request a

5

price reduction based on the total estimated volume of the BPA, regardless of the size of individual orders.

29.     BPAs are established directly with GSA Schedule contractors and contractual terms and conditions are contained in GSA Schedule contracts and are not to be re-negotiated for GSA Federal Supply Schedule BPAs.

30.     Requests For Quotation (RFQ's) issue from ordering office customers and specify the ordering office's requirements, including estimated quantities and work to be performed, and should advise GSA Schedule contractors whether the ordering office intends to establish a single BPA or multiple BPAs.

31.     All BPAs must contain certain information, such as the name of the GSA Schedule contractor; the GSA Schedule contract number; the BPA number assigned by the ordering office; a description of the requirement, to include estimated quantities and work to be performed; the prices and/or discounts; the extent of the obligation; any additional price reductions negotiated by the ordering office, based on the proposed dollar value of the BPA; a listing of individuals authorized to purchase under the BPA; the delivery or performance time frames; the location of deliveries; the frequency of ordering and invoicing; the date of BPA expiration; and, a statement that all other terms and conditions are contained in the GSA Federal Supply Schedule contract.

32.     Contractors selling under the GSA schedule are required to sell to the government at or below the GSA price.

33.     For every GSA order placed, a percentage of the sale amount must be reimbursed to GSA. This fee may be referred to as an Acquisition, Contracting and Technical ("ACT") or, more frequently, an Industrial Funding Fee ("IFF"). In either case, said fee is established to

recover GSA's expenses associated with awarding and managing GSA contracts, particularly BPA's, and is to be paid within 30 days after the end of each quarterly reporting period.

34.    FAR 47.303-6 defines "F.O.B. (free on board) destination", in relevant part, as being "(1) Free of expense to the Government delivered, on board the carrier's conveyance, at a specified delivery point where the consignee's facility . . . is located . . . ."

35.    When a GSA contract term, whether through a schedule contract or a BPA, or any other government contract, calls for delivery "F.O.B. destination", the Government should not be liable for any delivery, storage, or other charges involved before the actual delivery of the supplies to the destination, unless such charges are caused by an act or order of the Government acting in its contractual capacity. FAR 47.303-6.

36.    When a GSA contract term calls for delivery "F.O.B. destination", the contractor is required to pack and mark the shipment to comply with contract specifications or, in the absence of specifications, prepare the shipment in conformance with carrier requirements; prepare and distribute commercial bills of lading; deliver the shipment in good order and condition to the point of delivery specified in the contract; be responsible for any loss of and/or damage to the goods occurring before receipt of the shipment by the consignee at the delivery point specified in the contract; furnish a delivery schedule and designate the mode of delivering carrier; and, most significantly, pay and bear all charges to the specified point of delivery. FAR 47.303-6.

37.    That all GSA-related contracts between Defendant and the Department of Treasury and its bureaus (and non-GSA contracts between Defendant and the U.S. Mint) contain a contract clause (52.247-34) requiring that delivery be made F.O.B. destination.

38.    In the event the government purchaser required expedited shipping, the shipping amount charged was negotiated to be the difference between the actual cost of expedited shipping and the price of ground shipping or F.O.B. destination. In this manner, the government customer never paid full price for shipping; either the ground shipment was free as a result of F.O.B. destination or the expedited shipping was discounted.

39.    For Open Market Orders, those orders not associated with the GSA schedule or other government contract, contractors could/can charge the full amount for shipping, whether that shipping be by ground or expedited.

40.    Defendant obtained its GSA "base" contract with the Treasury Department during, on information and belief, 1998, and subsequently obtained a BPA with Treasury with the following Treasury bureaus becoming regular purchasers of Defendant's goods:

> The Alcohol and Tobacco Tax and Trade Bureau (TTB)
>
> Bureau of Alcohol, Tobacco & Firearms (ATF)
>
> Bureau of Engraving & Printing (BEP)
>
> Bureau of the Public Debt
>
> Federal Law Enforcement Training Center (FLETC)
>
> Financial Crimes Enforcement Network (FinCEN)
>
> Financial Management Service (FMS)
>
> Internal Revenue Service (IRS)
>
> Office of the Comptroller of the Currency (OCC)
>
> Office of Thrift Supervision (OTS)
>
> U.S. Customs Service
>
> U.S. Mint

U.S. Secret Service

41.     The Central Intelligence Agency regularly purchases goods from Defendant.

42.     From at least 1999 to the present, Defendant has paid its sales representatives ("Sales Reps") based upon the "gross profits" they generated from sales.

43.     During that same time period, Defendant's managers have received bonuses based upon total monthly sales generated by Sales Reps.

44.     Defendant's managers closely monitor Sales Reps' gross profit goals and, in the event gross sales goals were not being met, Defendant's managers either reprimanded or discharged the Sales Reps.

45.     Defendant's calculation of Sales Reps' gross profits entailed deducting both shipping and IFF (or where applicable ACT) from gross profits.

46.     That in order to maximize gross profits, Defendant's Sales Reps, with the knowledge and direction of Defendant's managers, undertook one or more of the following actions:

    a.   failed to indicate that a GSA schedule item was a schedule item;

    b.   increased the price of the product being sold over the GSA schedule amount; and/or,

    c.   charged the government customer shipping and, whenever possible, increased the shipping costs to the government.

47.     From 1999 to the later part of 2000, Defendant provided its Sales Reps with software that did not automatically characterize/select products to be sold as GSA schedule items.

48.     From the later part of 2000, Defendant instructed Sales Reps to characterize orders as "GSA orders" only if 51% of the items on the order were GSA schedule items.

49.     That during the spring of 2001, Defendant's computer software began automatically designating GSA schedule items as such.

50.     That in the event a Sales Rep chose to characterize a sale as a "GSA order," the 1.5% IFF was deducted from the Sales Reps' own gross profits.

51.     That based upon the manner in which Defendant's software failed to determine that sale items were GSA schedule items, Defendant's managers knew that Defendant had deliberately withheld substantial amounts of IFF from GSA.

52.     During a meeting involving Sales Reps and Chris Rother, the Director of Government Sales who oversaw all sales decisions and approved all commissions, Rother stated that if Defendant were audited by GSA, GSA would find that Defendant owed approximately $17 million dollars in IFF fees.

53.     In the event the government purchaser required expedited shipping, the GSA contract stated that the government would pay the difference between ground delivery and expedited delivery.

54.     That shipping costs reflected on the sales rep's shipping screen – the amount to be charged to the government – were higher than the shipping companies/carriers charged Defendant.

55.     As one of the largest shippers in the country, Defendant had negotiated special shipping prices with carriers and these negotiations gave Defendant substantial discounts which were not shared with the government.

56.     That, by way of example, Defendant's actual charge for Federal Express ("Fed-Ex") "3 day ground" was $1.99.

57.     That CDW-G inflated shipping costs through its Sales Reps not only treating Fed Ex "3 day ground" as if it were expedited shipping (which it wasn't), but also by charging government customers the full publicly-available shipping amounts listed on the Sales Reps' computer screen.

58.     Shipping rates were set in Defendant's system by Defendant's management and Sales Reps had no control over the prices reflected on the shipping/freight screen.

59.     Cheaper shipping options were frequently not available because the shipping screen would indicate that the Sales Rep could not select that cheaper shipping option for a particular item or, alternatively, that that shipping option was not available for a particular area.

60.     Sales Reps could always select the most expensive shipping options and FedEx was always available.

61.     Defendant's managers actively encouraged sales reps to not only shift shipping costs but to inflate those costs whenever possible.

62.     That manager Bob Rossie frequently inquired about why shipping charges had been overwritten and, when Relator responded that Defendant was supposed to give the government the cost difference between expedited and ground shipping, Rossie reiterated that the government procurers "don't know what they're doing" and Relator "needed to charge them the whole amount."

63.     That although the U.S. Mint is a treasury bureau, Defendant did not sell to the U.S. Mint through the GSA schedule, but rather through a $30 million dollar contract awarded to Defendant during June/July 1999.

11

64.     That the terms of the U.S. Mint/CDW-G contract are identical, in all relevant respects, with the sales terms under the GSA schedule, including shipping terms.

65.     Defendant's managers, particularly Rossie, directed Relator to take advantage of purchasers at the U.S. Mint and other treasury bureaus and to "find a way to send more expedited shipping".

66.     That Rossie additionally instituted a policy where Defendant reversed the normal shipment procedures and began shipping overnight *unless* Defendant was told otherwise.

67.     In one instance of following such directions, Relator shipped a 2-3 ounce memory chip to Pricilla Phillips of the U.S. Mint in 2000 at an overnight charge of $29 when the actual overnight charge was approximately $3.99.

68.     As a result of such direction, for almost two and one half years, the Mint, as well as other Treasury bureaus, were continually overcharged for shipping

69.     During the period in which all of the matters alleged herein occurred, Defendant continued to obtain additional government contracts while concealing its illicit practices, namely the withholding and nonpayment of IFF, shipping overcharges, and the matters set forth below.

70.     In addition to the non-selection of GSA schedule items and increasing the cost of shipping, and failing to offer "most favored customer" pricing in violation of the government and GSA base contract, sales were also fraudulently manipulated in the following manner:

        A.     In the event a government purchaser sent a purchase order in excess of the quoted price, Defendant trained Sales Reps not to notify the purchaser of the discrepancy but rather to "keep the difference" and conceal the excess by attributing it to shipping cost;

        B.     Though Defendant did not insure its orders for delivery, Sales Reps

frequently hid the excessive shipping charges by telling government procurers that the amount reflected not only shipping but "insurance and handling" charges that did not exist;

C.    The "extra-net" was a specialized, custom-made web site which Defendant made for customers to permit customers to directly access Defendant's merchandise and order accordingly. Manager Rossie, however, insisted that Sale Reps do "whatever they could" to convince customers to e-mail orders to Sales Reps so that Sales Reps could "play" with the price. This invariably and directly led to charging five ($5.00) to ten ($10.00) dollars over the extra-net price in violation of "most favored customer" practices;

D.    The Director of Government Sales, Chris Rother, would frequently direct that there would be "no returns" and prevented Sales Reps from issuing return merchandise authorization ("RMA") numbers to government customers.

      i.    Among the items purchased by the Mint that were not returned were Apple display screens (from a Cheryl Moody order) and rolling carts with shelves;

      ii.    That Rother directed Relator to tell Mint personnel that "we're working on it (issuing an RMA)" and that the inability to receive a refund had "something to do with the manufacturer." In these instances, Defendant forced Relator to lie to the Mint personnel.

      iii.    In one very blatant example of a "nonreturn"   Relator

shipped an $18,000 Marconi router/switch to the Mint that the Mint couldn't use. Defendant refused to accept the item as a return and, at the time of Relator's departure from Defendant, the Marconi switch had not been returned. In another example, the head IRS purchaser in Atlanta, Ann Baker, ordered a Lexmark Printer shipment and Relator sent out the wrong product to the wrong location. Although the error was completely the Relator's, Relator, at the direction of Chris Rother, refused the return.

E.      Selling items (such as enterprise level CISCO routers and Wyse terminals) for which Defendant was not an authorized dealer. Such sales denied the government purchasers of technical support, warranties and the ability to obtain a refund for, or to return, the item;

F.      Selling non trade compliant items such as certain Tektronix printers (from 1999 to 2001) and accessories which originated from non trade compliant countries. While the government could purchase such items through an open market card, the items could not be listed on the GSA schedule. Despite this, Defendant knowingly listed approximately 20-25 similar items (such as certain HP backup tapes) which were created or assembled in non-trade compliant countries. Because Defendant deliberately placed every item into one database, trade compliant and non trade compliant goods were commingled;

G.    Obtaining an IRS contract for delivery of approximately 3000 printers (approximately a $3,000,000.00 order) under an IRS BPA (TIRNO2000) based upon intentionally false statements to IRS personnel that Defendant could "batch" invoice according to contract line item number ("CLIN"), stockpile and warehouse the printers, implement an asset tag program for said printers and ship said printers on an "as needed" basis. Concerning all the Treasury printer orders, CDW-G fabricated the asset tag spreadsheets in order to receive payment;

H.    Failing to pass manufacturer rebates and other discounts back to government purchasers;

I.    Leading CIA contractors to believe that authorized persons with appropriate clearances were placing their orders when in fact such orders were placed in the same manner as any other customer and "log-ins" and orders were completed under Chris Rother's name, an individual who did not have clearance.

71.    Relator believes the fraud as outlined above has been ongoing from 1999 to the present.

72.    All of the above described actions were taken by Defendant's employees at the direction of and with the full knowledge of Defendant's managers and supervisors.

73.    Defendant's actions as stated above resulted in Defendant presenting false Claims and reports to the Government.

74.    That 31 U.S.C. § 3729 of the False Claims Act states as follows:

Liability for certain acts. Any person who –

    (1)    knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent Claim for payment or approval;

    (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

    (3)    conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

    (4)    has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

    (5)    authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

    (6)    knowingly buys, or receives a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or

    (7)    knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person, except . . . .

75.    That in addition to treble the actual damages suffered by the Government,

Defendant is liable to the United States Government for a civil penalty of not less than $5,000

and not more than $10,000 for false claims it submitted prior to September 29, 1999 and not less

than $5,500 and not more than $11,000 for any false claims it submitted to the Government on or

after September 29, 1999, in violation of 31 U.S.C. § 3729 and 28 CFR 85.

76.   By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false statements to obtain Government payment for false and fraudulent Claims.

77.   By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

78.   Defendant has not notified the United States Government of its violations of the FCA.

79.   The United States, unaware of the falsity of the records, statements or Claims made by Defendant, paid Defendant for Claims that would otherwise not have been allowed.

80.   The United States, unaware of the falsity of the records, statements or Claims made by Defendant to conceal existing obligations to the government, entered into additional government contracts with Defendant which the government would otherwise not have entered into.

81.   By reason of these payments, the United States was damaged from January 1, 1999 to the present in a substantial amount.

WHEREFORE, the United States of America, by the Relator, Joseph Liotine, prays this Court give judgment in its favor against Defendant CDW-G, Inc., and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729, et seq., specifically that:

   A.   Defendant pay a compensatory amount equal to three times the amount of damages the United States of America has sustained for each false Claim submitted by Defendant, plus a civil penalty of $10,000 per false Claim submitted prior to September 29, 1999, and $11,000 per false claim

submitted after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. § 3729(a) and 28 CFR 85;

B.       Defendant pay Relator's reasonable costs and expenses, including reasonable attorneys fees, pursuant to 31 U.S.C. §3730(d)(1);

C.       Relator be awarded the statutory percentage of the amount received by the Government pursuant to 31 U.S.C. § 3730 (d)(1); and

D.       Such other and further relief as this Court deems just and proper.

## COUNT II

### False Claims Act 31 U.S.C. §3730(h)
### (Retaliatory Discharge)

NOW COMES the Plaintiff, Joe Liotine (hereafter "Liotine"), by his attorney,  Dale J. Aschemann of Aschemann Keller LLC, and for Count II of his Complaint against CDW-G, Inc. (hereafter "Defendant") alleges as follows:

1.       This is an action for damages arising from the illegal discharge of Liotine by Defendant in violation of the False Claims Act, 31 U.S.C. §3729, et seq., as amended (hereafter "FCA").  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730 (h).

2.       Defendant is an Illinois corporation with its principal place of business in Illinois.

3.       Defendant is a wholly-owned subsidiary of CDW Computer Centers, Inc., an Illinois corporation.

4.       Defendant contracts with the United States of America (hereafter  "Government") through the General Services Administration (GSA) as a reseller of information technology,

equipment, services, and products. The Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732 (a).

5.     Venue is proper in this District pursuant to 31 U.S.C. § 3732 (a) because Defendant can be found in, resides in, transacts or has transacted business in the Southern District of Illinois.

6.     Relator, Joe Liotine ("Relator"), is a citizen of the United States and a resident of the States of Illinois.  From March 20, 1997 to July 7, 2001,  Relator was employed by Defendant as a  customer service representative, shipper, and later as a sales representative in Defendant's federal sales unit with responsibilities including sales to the Treasury Department including the IRS, Customs, the Mint, Alcohol Tobacco and Firearms, the Bureau of Public Debt, virtually every bureau under the Treasury Department as well as the Central Intelligence Agency.

7.     Liotine brings this action for violation of the FCA on behalf of himself pursuant to 31 U.S.C. §3730(h).

8.     Liotine was hired by Defendant on March 20, 1997 and, from the date of hiring to approximately November, 1999, Liotine worked in customer service. Liotine subsequently worked for approximately 3 to 6 months as a "shipper" responsible for correcting mis-shipped items, approximately 3 months as a telemarketer, and became a sales representative in February, 1999.

9.     As a sales representative, Relator received and filled purchase orders/requests from federal agency procurement offices, procurement officers, or regular government offices on behalf of Defendant.

10.     When Relator began as a federal sales representative, Relator worked with approximately 50 other sales reps dedicated to federal government sales. When Relator departed Defendant, that number had risen to approximately 200.

11.     In addition to the federal sales reps, CDW-G employed an additional 100 sales reps dedicated to city and state government sales and sales to municipalities.

12.     Relator incorporates the allegations of Count I, paragraphs 9 through 74 as if fully set forth herein.

13.     That Relator's manager, Bob Rossie, instructed Relator to take advantage of certain black purchasers at the U.S. Mint whom Rossie referred to as "stupid niggers".

14.     Shortly thereafter, Relator approached Rossie and told him that he didn't think it was right to take advantage of these black purchasers and that he thought it was wrong the way CDW-G was defrauding the government on shipping, insurance, returns, etc.

15.     Rossie responded that Relator shouldn't make such accusations and that Relator should reconsider whether Relator really knew what he was talking about.

16.     Shortly after this conversation with Rossie, Relator began having inexplicable scheduling problems: he would return from training only to find that the schedule had been changed to reflect that his training was on a different day and his printed schedules were also removed from his cubicle.

17.     That when he and co-worker Annette Arnold, who worked in state and local sales, returned to work after lunch and attending training, managers brought it to Relator's attention that his training time had been changed and that he had been tardy from work.

18.     That conversely, Relator would miss product training because his training schedule would be changed without notice to him.

19.    As a result of such instances, management began frequently "writing up" Relator and, after three such "write ups", Relator was suspended for a week.

20.    Prior to Relator's discussing illegal practices with Defendant's management, Rossie let Relator change his schedule virtually at will.

21.    Only when Relator began questioning the sales practices alleged herein did Relator begin getting written up for being late.

22.    That Rossie took Relator's "tardiness" issue to his immediate boss, Brett Schmidt and subsequently "wrote up" Relator.

23.    That after Relator began questioning the illegal sales practices set forth above and stopped following Defendant's directions regarding same, Rossie became verbally abusive and began calling Relator a "bitch" or "pussy" for complaining.

24.    That as the abuse grew, Relator verbally responded to Rossie and was taken to Chris Rother's office to be terminated.

25.    That in this "termination" meeting, Relator divulged the substance of his exchanges with Rossie and Relator was not terminated or written up at that time.

26.    That Relator handled some sales involving contractors for the Central Intelligence Agency (CIA).

27.    That the CIA contractors required, and were led to believe, that authorized persons with appropriate clearances were placing their orders.

28.    That the CIA contractor orders were placed as if they were no different than any other customer and "log-ins" and orders were completed under Chris Rother's name, an individual who did not have clearance.

29.    With respect to CIA-related sales, Relator expressed displeasure to management with the way Defendant lied to the contractor regarding security measures Defendant never intended to implement.

30.    That Relator approached manager Larry Kirsh and told him that Rossie was potentially compromising national security and potentially endangering people's lives to make a sale.

31.    That Kirsh responded that if Relator wanted to keep his job, he should "shut up and go back to your desk."

32.    Shortly thereafter, Relator called Simon Fritz of the Mint and told Fritz to begin scrutinizing Defendant's prices.

33.    Relator told Fritz to "check out our (Defendant') pricing; I don't think we're competitive."

34.    That Fritz called Relator and said he needed a spreadsheet of every item the Mint had purchased from CDW, including part number, price, etc.

35.    Regarding the spreadsheet, Chris Rother flatly refused to provide it because Fritz would see that Defendant wasn't in the top three to five percent in customer pricing on C-Net.

36.    That Relator was reprimanded for supplying the Federal Government with their own order and/or invoice history.

37.    That Relator was told that he should not give the government any information and that if they wanted such information, they could/should get it themselves from the extranet, a function which never worked properly for the Mint.

38.    I subsequently ignored these instructions and e-mailed Simon Fritz with more information.

22

39.    That knowing he was about to be discharged and in order to inform other purchasers of the actions CDW-G was taking to defraud them, Relator copied the names and phone numbers of the accounts in his system and emailed them, using his wife's office work station, to a personal address in order to have evidence to show the Federal Government.

40.    That CDW-G management questioned Relator about the information that he had given to the Federal Government and to what issues he had alerted the Federal Government.

41.    That CDW-G management met Relator off-site to determine what he really knew about company procedures and questioned how he knew some of the information that he possessed.

42.    That Relator was terminated and was told that if he did not sign a form containing CDW-G's description of why he was terminated he would not receive full payment/compensation for what CDW-G owed him.

43.    The stated reason for discharge was false and pretextual.

44.    Relator was discharged because he refused to participate in schemes to defraud the federal government and had indicated the same to Defendant's management and others that the practices were illegal.

45.    That Section 3730(h) of the FCA states:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this

23

subsection.

46.    That the Relator engaged in protected conduct and Defendant discharged Relator for lawful actions he took in furtherance of the filing of an action under 31 U.S.C. § 3729.

47.    As a direct and proximate cause of the foregoing, Liotine has lost, and will continue to lose, income and benefits and has suffered intangible losses, including mental anguish, embarrassment and inconvenience.

WHEREFORE, the Plaintiff Joseph Liotine prays this Court give judgment in his favor against Defendant CDW-G, Inc., and issue orders in accordance with the False Claims Act, 31 U.S.C. §3729, et seq., specifically that:

A.    Defendant immediately reinstate Liotine to his former job at the same rate of pay with normal pay increases from the date of discharge to the date of reinstatement;

B.    Defendant pay Liotine two times the amount of back pay, plus interest on the back pay, from the date of discharge to the date of reinstatement;

C.    Defendant pay Liotine's costs and attorneys fees in accordance with 31 U.S.C. 3730(h); and,

D.    Such other and further relief as this Court deems just and proper.

## <u>REQUEST FOR TRIAL BY JURY</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

trial by jury.

Respectfully Submitted:

Dale J. Aschemann
Illinois Bar #6269347
ASCHEMANN KELLER LLC
108 West Jackson Street
Marion, Illinois 62959
Telephone: (618) 998-9988


Attorney for Relator,
Joe Liotine

25