**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.,* JOE LIOTINE, Individually, | ) | |
| | ) | No. 05-CV-33-DRH-DGW |
| Plaintiffs, | ) | |
| | ) | CJRA TRACK: C |
| v. | ) | |
| | ) | JUDGE: David R. Herndon |
| CDW-GOVERNMENT, INC., | ) | |
| An Illinois Corporation, | ) | MAGISTRATE JUDGE: |
| | ) | Donald G. Wilkerson |
| Defendant. | ) | |

**RELATOR'S MEMORANDUM IN OPPOSITION TO DEFENDANT CDW-GOVERNMENT, INC.'S MOTION *IN LIMINE* TO EXCLUDE THE DATA ANALYSIS AND TESTIMONY OF JEREMY ALBRIGHT (Doc. 224)**

## I.    INTRODUCTION

Dr. Jeremy Albright was retained by Relator Liotine to perform a very straightforward, technical function:  He was asked to summarize a very large amount of evidence produced by Defendant CDW-G.  Specifically, Dr. Albright was asked to gather together various pieces of disparate electronic data produced by CDW-G into a single, functional, data set and to run queries on that data according to parameters established by Relator's prosecution team. Set forth below is an explanation of the circumstances of his receipt of the data, a description of the data he received, the instructions he received to cull relevant information from that data, and the processes that he followed in undertaking that exercise.

The result: Dr. Albright compiled summary charts of data for this Court and the jury to consider.  His summary charts are explicitly permitted by the terms of Fed.R.Evid. 1006.  All of the information underlying the summaries derived from CDW-G's discovery responses and has been provided back to CDW-G along with a clear explanation of how the data was analyzed and the charts prepared.  In sum and substance, Albright simply performed a clerical task---he

compared data and made summary charts.  These are exactly the types of tasks that civil litigants routinely employ to present voluminous data in an easily-understood format as contemplated by Fed.R.Evid. 1006.

Though the purpose and effect of Dr. Albright's data compilations have been explained to CDW-G on numerous occasions, CDW-G refuses to acknowledge the truth of the matter.  CDW-G has filed a motion to exclude Albright's data compilations from this case by pretending that those compilations are something that they are not---by pretending that Albright is offering expert opinions that he has not and will not offer.  Albright has nothing to say about the intricacies of the Trade Agreements Act, or about how government contracting works, or about CDW-G's responsibilities and duties to Federal Government customers.  For such expert witness topics, Relator Liotine retained a former General Services Administration executive (Neal Fox) to present such expert evidence to the jury.  CDW-G doesn't even mention Mr. Fox in its motion. Instead, CDW-G pretends that Albright is offering the opinions of Mr. Fox. But he isn't.  None of the expert subjects addressed by Mr. Fox have anything to do with the functions Albright was asked to perform.

Ultimately, CDW-G's motion is a straw man: it seeks to preclude Dr. Albright from stating opinions which he has neither voiced nor indicated he would offer. One will search in vain through Albright's deposition testimony or his report for any example of an expert opinion about CDW-G. The reason for this is that it isn't germane to Albright's work in this case. In fact, Relator's counsel has explicitly indicated --- on numerous occasions --- that Albright's involvement in this case is limited to comparing and summarizing CDW-G's own data. The summarizations done by Albright were necessary, in significant part, due to the manner in which CDW-G produced the mass of diverse electronic information in this case. Additionally, as will

be explained below, CDW-G's refusal to produce data until compelled by the Court necessitated the continuing adjustment of Albright's summarizations as additional data was received.

That a report was produced at all from Dr. Albright is owed to the fact that Albright has summarized data in a fashion that Relator Liotine intends to use at trial.  Relator's counsel has produced those summaries to CDW-G as they received them. Albright's education and experience with particular software packages permitted him to undertake the task with which he was charged and, to the extent his methods in constructing the dataset and sorting the data could be challenged, he was disclosed to CDW-G and reports were produced. It is important to note, however, that CDW-G does not take issue with the single dataset composition, the manner in which he merged the data, or the queries he constructed. CDW-G has raised no objection to any of these things and offered no expert to rebut his methodology in analyzing the data. CDW-G's Motion *in Limine* should be denied.

## II.   DR. ALBRIGHT'S QUALIFICATIONS TO MERGE AND ANALYZE SALES DATA.

Dr. Albright is the President and Senior Research Scientist at Methods Consultants of Ann Arbor, LLC.[1] He attended graduate school at Indiana University where he studied political science with specialties in comparative politics, public policy, and statistical methodology.[2]  He obtained his doctorate in 2008.[3] During his tenure at Indiana University, Albright took approximately eight graduate-level courses in statistics.[4] During subsequent employment at the University of Michigan, he attended an additional five courses.[5] Albright has considerable experience in structural equation modeling and constructing random effects models.[6] He is

---

[1] Exhibit A (Curriculum *Vitae* of Jeremy J. Albright) at pg 1.
[2] Exhibit B (Albright Depo. Excerpts) at pg. 40.
[3] Exhibit A (Curriculum *Vitae* of Jeremy J. Albright) at pg. 1.
[4] Exhibit B (Albright Depo. Excerpts) at pg. 43.
[5] *Id.*
[6] *Id.*

skilled in ten different statistical software packages[7] and routinely writes his own programming code to manipulate and analyze data.[8] Immediately prior to working at the University of Michigan as a Research Investigator, Albright worked as a statistics consultant at the Indiana University Stat/Math Center while at the same time teaching math at a community college in Bloomington, Indiana.[9] Albright graduated from high school in three years and studied in Spain for a year as a Fulbright Scholar.[10]

      With respect to the handling and manipulation of data, Dr. Albright's qualifications are unimpeachable. In fact, as to the data comparisons and summary charts that Albright has produced in this case, CDW-G does not challenge the accuracy of them at all.  Albright's summary charts reflect a comparison of CDW-G sales data with CDW-G "country of origin" charts that identify where the goods were made. The CDW-G "country of origin" charts identify whether a good was made in a trade-compliant or "designated country"---as that term is used in the United States Trade Agreements Act.  Albright's charts simply identify the number of times that a product sold to the Government came from a country that was not a designated country.

      CDW-G does not contend that Dr. Albright's charts have somehow erred in comparing CDW-G's data in this fashion. Instead, CDW-G pretends that Albright is somehow making a determination as to whether CDW-G violated the Trade Agreements Act for sales of products from non-designated countries. Albright is doing no such thing.  Again, he is merely identifying the instances where a product that appears on CDW-G's own country-of-origin list as made in a non-trade-compliant country was sold to the Government.

      Given the actual clerical tasks that Dr. Albright performed---which CDW-G either

---

[7] Exhibit A (Curriculum Vitae of Jeremy J. Albright) at pg. 1.
[8] Exhibit B (Albright Depo. Excerpts) at pg. 44.
[9] *Id*. at pg. 49.
[10] *Id*. at pg. 40 and pg. 51.

ignores or wildly mischaracterizes in its motion---Relator has consistently refrained from referring to Albright's summary charts as "opinions" of any kind.  They are not "opinions." Rather, they are factual data comparisons.  As Relator's counsel indicated in a letter to defense counsel on August 18, 2011, "[t]hough I produce Dr. Albright's information in the format of an expert report, I wish to be clear that his data compilation is simply the merger of disparate electronic data into a functional data set and performing queries upon that data set pursuant to parameters he has been provided."[11] Our position then, as it is now, is that Albright was provided with data and asked to perform a task with specific instructions. Whether that data was CDW-G sales data, census information, or baseball statistics, the methodology of compiling and comparing the information and constructing queries would not have changed.

Should the Court determine that the compilation and query methodology set forth in his report does constitute an expert opinion, Dr. Albright unquestionably possesses the knowledge, skill, experience, training, and education to render such an opinion. But such a determination is unnecessary.  CDW has raised no issue regarding the reliability of the principles and methods used in compiling the data, nor has CDW-G indicated that Albright applied those methods in an unreliable manner. CDW-G's entire objection to Albright is based upon the flawed premise that, because Albright is unfamiliar with CDW-G's sales practices, he is unable to say anything about the data flowing from those practices.  CDW-G is incorrect.

## III.   MERGER OF ELECTRONIC SALES INFORMATION AT ISSUE: AS400 Sales Data, Country of Origin Information, and Price Codes

### A.   AS400 Sales Data

On November 25, 2008, Relator propounded Requests for Production and Interrogatories seeking the information contained in CDW-G's sales databases. In response to these requests,

---

[11] Exhibit C (August 18, 2011, Letter from Dale Aschemann to David Nadler and David Yang).

CDW-G produced two USB hard drives and various DVD's containing an enormous volume of documents. Within this production were three Excel spreadsheets produced as Bates Nos. CDW-G000474-000476 ("474-476"). These spreadsheets displayed, line by line, all sales for the years 1999 through 2001. Each line contained twenty-two pieces of information organized in vertical columns with each column labeled across the top of the spreadsheet. CDW-G did not produce with those spreadsheets any accompanying information which would explain the spreadsheets. Also conspicuously absent were the unique characters or "codes" which would explain the various columns of sales information such as account type, price code, and pay term.

On November 4, 2010, Relator's counsel conducted a deposition pursuant to Fed.R.Civ.P. 30(b)(6) to determine, among other things, the source of the sales data and an explanation of the twenty-two columns of sales information.[12] The deposition testimony confirmed that the sales data contained in the aforementioned spreadsheets derived from CDW-G's AS400 computer database, that the twenty-two columns of sales information represented a subset of the universe of sales data contained in the AS400 computer database, and that various codes existed which would explain the contents of the sales data. With regard to one of the columns entitled "price code", Adams testified that a price code identifies whether an item is sold "on a contract or not."[13] He further testified that the absence of a price code meant that an item was sold "open market", that is, not pursuant to a Government contract purchasing vehicle, and revealed that the use of a price code "key" permits one to know, by line item, whether an item was ordered pursuant to a Government contract,[14] including a General Services Administration ("GSA") contract.[15]

---

[12] Exhibit D (Adams Depo. Excerpts) at pp. 9-27.
[13] *Id*. at pp. 20, 21, 23-25.
[14] *Id*. at pg. 21.
[15] *Id*. at pg. 21.

Following Adams' deposition, Relator moved to compel production of the entire AS400

sales database in a "useable" format, that is, one which would allow Relator to sort and query the

data. Relator also sought an Order requiring production of sales data from "1999 to the present",

not simply 1999 through 2001 as CDW-G had produced. The Court granted both motions on

April 26, 2011, and ordered production of the AS400 sales data by June 1, 2011.[16] At that time,

CDW-G produced the sales data in the Microsoft program Access.

### B.     Country of Origin Information

During the process of obtaining AS400 data, Relator's counsel continued to review the

electronic files produced by CDW-G. The "responsive" documents produced by CDW-G were

correlated in no way with Relator's discovery requests and produced without an index to identify

the contents of the disks.  One disk contained an electronic folder containing 1,001 individual

subfolders with each sub-folder containing as many as seven thousand (7,000) files/documents.

With the exception of some Excel spreadsheets, the documents were produced in Tagged Image

File Format ("TIFF"). TIFF format is akin to a photograph of a document; it does not permit data

manipulation such as sorting or conducting queries.

Within this mountain of information resided certain Excel spreadsheets pertaining to

GSA contract modifications. These modifications identified when products were added to, or

removed from, the list of products sold under the GSA contract---a list of products that is known

as the "GSA schedule"--- and, in some instances, the modifications contained information

identifying the country of origin of certain products. CDW-G also produced a portable hard-drive

(Bates-numbered CDW-GG-HD-00000002) which contained the country of origin information

for the company Hewlett Packard ("HP").[17] While the contract modifications and country of

---

[16] Doc. #166.
[17] Exhibit E (May 31, 2011, Letter from CDW-G counsel re country of origin materials produced).

origin documents were contained in Excel spreadsheet format, and were therefore able to be manipulated, the spreadsheets themselves were not composed in a uniform format.[18]

C.    Price Codes and Dr. Albright's "Third Report"

One of the central issues in this case is whether CDW-G sold goods to the United States from non-designated countries in violation of the Trade Agreements Act ("TAA"). When a sale is made pursuant to the GSA schedule, the item sold must be TAA compliant. The methodology necessary to identify whether TAA violations have occurred, however, requires not only the correlation of a sold product with that product's country of origin information, but also matching that same sale with a price code that denotes a contract containing a TAA provision, such as the GSA contract. In simplest terms, in order to determine whether a TAA violation has occurred, one must identify whether the contract associated with the sale required TAA compliance.

Though CDW-G representative Kevin Adams' testimony revealed that CDW-G's "price codes" were, and are, clearly part of CDW-G's sales data, CDW-G claimed that the "price code" information was not responsive to the Court's Order to produce all AS400 sales data. To obtain the "price code" information, Relator had to again approach the Court to compel its production. This eventually resulted in yet another Court order[19] on June 29, 2011, to which CDW-G complied on July 18, 2011 (CDW-GG-TD-00000001).[20] Arranged in three columns in an Excel spreadsheet, the price codes numbered 2,975 with approximately 146 such codes identified as "CDW-G GSA Schedule Code". With the AS400 sales data, country of origin information, and price codes, Dr. Albright was finally able to commence work on comparing the relevant data, and his first report was completed on August 16, 2011. In an effort to further clarify the meaning

---

[18] Not all of the country of origin information CDW-G produced was in a manipulable format. With the exception of HP and a few vendors, a substantial amount of that data was produced in TIFF format.
[19] Doc. #190.
[20] Exhibit F (July 21, 2011, Letter from CDW-G counsel regarding production of price code information).

of CDW-G's "price code" information, Relator requested a Fed.R.Civ.P. 30(b)(6) deposition. When CDW-G objected to producing a 30(b)(6) witness, the Court Ordered CDW-G to submit answers to written deposition questions pursuant to Fed.R.Civ.P. 31. CDW-G filed those Answers on September 12, 2011.[21] In Response "1c" to those Answers, CDW-G stated that it had "inadvertently" marked certain price codes "No" under the "CDW-G's GSA Schedule" column and "inadvertently" marked another as "Yes" in the same column. This discrepancy and the inclusion of additional price codes discovered during depositions of CDW-G employees necessitated revision of Dr. Albright's original report. That second report was completed on September 30, 2011. Following receipt of CDW-G's expert reports on October 4, 2011, Relator's counsel directed Albright to revise his report to address information raised by CDW-G's own expert reports. That report was completed on November 3, 2011, and, regardless of CDW-G's arguments addressing Albright's first two reports, the November 3 report supersedes the two prior reports and is the *only* report about which Albright will testify.

### D.    DR. ALBRIGHT'S TASK

Upon receipt of price code information, Dr. Albright began assimilating the various data. His deposition testimony described the process as a "straightforward programming exercise involving merging different sources of data into a single file" which he characterized as a "common data management task."[22]  Using the software program "SAS", Albright was able to combine all of the country of origin charts and the 29 million sales transactions into a single file. This allowed Albright to identify a sold product's country of origin on the transaction's invoice date and the contract under which the sale was made. This process also allowed Albright to "account for the fact that plausibly one part number would be manufactured in one country at

---

[21] Doc. #204.
[22] Exhibit B (Albright Depo. Excerpts) at pg. 45.

one time, but then switched to a different country at a later time."[23]

CDW-G contends that Dr. Albright's work is flawed because he was unfamiliar with the source of the data. CDW-G makes much of the fact that Albright was given data by attorney Vincent McKnight, implying none-too-subtly that McKnight is a shadowy figure who fed Albright fabricated data. Nothing could be further from the truth.

As reflected in the attached Declarations of Vincent McKnight[24] and Dale Aschemann,[25] McKnight is a member of Relator's prosecution team and was acting at all times at the direction of Liotine's counsel.[26] Though CDW-G asserts repeatedly that Dr. Albright's report is based on "third party country of origin reports that CDW-G had no role in preparing, maintaining, or updating",[27] the undersigned provided McKnight with *only* data produced by CDW-G in this case.[28] In short, with the exception of a list of designated countries derived from the Federal Acquisition Regulations, Albright's November 3 report is based exclusively on materials produced by CDW-G and any representation to the contrary is false.

In undertaking the queries to be constructed for his final report, Dr. Albright followed parameters established exclusively by Liotine's counsel. With those parameters, Albright simply ran computer queries and made summary charts. For instance, the AS400 sales data contained information for *all* CDW-G sales including irrelevant transactions---transactions that did not

[23] Exhibit B (Albright Depo. Excerpts) at pg. 46.
[24] Exhibit G Declaration of Vincent McKnight.
[25] Exhibit H Declaration of Dale Aschemann.
[26] CDW-G attempted to obtain the communications between McKnight and Relator's prosecution team by serving a subpoena upon Mr. McKnight. That subpoena issued from the U.S. District Court for the District of Columbia. The Court there refused to enforce it, finding that the parties shared a common legal interest in the outcome of the instant litigation against CDW-G and that the communications between them are protected by a common interest privilege. *CDW Government, Inc. v. McKnight & Kennedy, LLC and Brady Folliard*, Case No. 1:10-mc-00789 (August 10, 2011 D.D.C.).  A copy of the *Folliard* Order is attached hereto as Exhibit I.
[27] Doc. 225 (CDW-G Memo in Support of Motion *In Limine*) at pg. 11.
[28] It is well to note that Albright's November 3, 2011, report was prepared and submitted *after* his October 4, 2011, deposition. Thus, any deposition testimony that CDW-G uses in an attempt to undermine the November 3 report is misplaced and inappropriate. CDW-G has no factual basis to attack the substance of Albright's November 3 report and any observations about it are purely speculative.

involve Federal Government purchasers, such as those involving municipalities and universities. Because Relator is only interested in federal sales, Albright was directed to concentrate on the government "account type" with the "subtypes" "C" and "D" --- civilian and defense --- federal government purchasers.

Next, Dr. Albright was directed to use the "invoice date" --- and not the "order date" --- as the operative time for transaction analysis. As Kevin Adams testified, and as repeated in his expert report, the CDW-G invoice to a Government purchaser is issued at the time that a product is shipped from CDW-G to the Government purchaser, not at the time that the sales order is originally taken--- so the "order date" and the "invoice date" may not be the same.[29] This is because an item may be ordered but, for whatever reason, is unable to be shipped. Relator's counsel opted to have Albright's summary charts be made based on the "invoice date" for a simple reason: CDW-G's GSA Schedule contract speaks in terms of delivery: "The Offeror by signing this offer, certifies that each end product to be **delivered** under this contract is a U.S. made end product, [or] a designated country end product . . . ." (emphasis added).[30]  Since the False Claims Act is implicated by a false claim for payment that is actually presented to the Government, the "invoice date" is more relevant than the "order date."

In its motion, CDW-G makes much of Dr. Albright's use of the terms "compliant" or "non-compliant" to describe his summary charts.  For CDW-G, this is somehow proof that Albright is offering expert opinions regarding the TAA.  CDW-G is gratuitously misreading Albright's report.  As is clear from Albright's narrative accompanying his summary charts, it was Relator Liotine's counsel, not Albright, that decided to use the word "compliant" or "not-compliant" in the reports to describe the results of the summary charts. Such terms are merely

---

[29] Exhibit D (Adams Depo. Excerpts) at pg. 16.
[30] Exhibit J GSA Contract, Trade Agreements Act Certificate, para. G.3, pg. 80; effective January 21, 1999.

descriptions which denote the sale of goods to the United States from non-designated countries. That is a term adopted by the Liotine prosecution team for items "flagged" by Albright's summary charts.

In addition to the above, Liotine's counsel directed Dr. Albright to pay particular attention to the 146 price codes identified by CDW-G as "CDW-G GSA Schedule Code". Those queries reveal abundant examples where CDW-G sold goods from non-designated countries and reported them as GSA schedule sales.

According to CDW-G, its sales of goods from non-designated countries under the GSA contract is evidence of nothing about its trade compliance activities because government purchasers are free to ignore the GSA schedule contract and purchase "open market", that is, off contract, literally at-will.[31] Thus, CDW-G contends that it is necessary to look at every transaction individually to understand the unique and legitimate "complexities" surrounding the facially illegitimate sales.[32] Leaving aside the notion that CDW-G can simply sell items off schedule whenever it wants,[33] there are two problems with this approach. First, the identified sales do not contain one of CDW'G's many price codes denoting "open market". They contain price codes which CDW-G itself has identified as a "CDW-G GSA Schedule Code". As CDW-G's Senior Program Manager for the GSA schedule contract, Sheryl McCurnin, testified, the presence of such a price code denotes that an Industrial Funding Fee ("IFF") was paid to GSA.[34] There is simply no way to reconcile this situation except to conclude that CDW-G improperly

---

[31] Exhibit D (Adams Depo. Excerpts) at pg. 34.

[32] Exhibit K (McCurnin Depo. Excerpts) at pp. 83, 84, 85.

[33] Exhibit D (Adams Depo. Excerpts) at pg. 34. The idea that CDW-G can sell schedule items to federal purchasers in an open market manner without any exceptions is a proposition contested by Relator's expert Neal Fox.

[34] Exhibit K (McCurnin Depo Excerpts) at pp. 61, 109. Senior Program Manager McCurnin testified in the following manner: Question: "…If after the fact, though, I see a price code associated with a particular sale and it's flagged as a yes that you would have remitted IFF payment for that, can I assume that item would have been sold pursuant to the schedule or a BPA?" Answer: "Yes".

sold non-trade compliant goods to government customers and reported those sales as legitimate GSA contract offerings.

But the real problem with CDW-G's contention is this:  CDW-G has no evidence to support its argument that it was ever actually allowed to sell non-trade-compliant goods to the United States under a contract that required TAA compliance.  According to CDW-G, even when a non-trade-compliant good is sold under a contract that required TAA compliance, there still must be a "transaction by transaction" analysis to see if some exception might have actually allowed the sale to occur.  The evidentiary problem for CDW-G is that it has failed to identify *any* such examples despite being specifically and repeatedly asked to do so.

On March 9, 2011, CDW-G responded to Relator's interrogatories 20 and 22 which, taken together, asked CDW-G to identify all sales for which the TAA would not apply.  Rather than answer that straightforward question, CDW-G responded that no sales violated the "False Claims Act."[35]  The next day, March 10, 2011, Relator's counsel forwarded a letter to CDW-G counsel indicating that CDW-G's answer was non-responsive and reiterated a demand that it produce information identifying which individual sales actually didn't have to comply with TAA.[36]

Relator's counsel waited a month and, having received no response from CDW-G, sent another letter on April 6, 2011.[37] Following passage of another two weeks, CDW-G finally responded, on April 18, 2011, but still refused to identify any sales that didn't have to comply with TAA.  Instead, it responded that the case was only about certain sales between 1999 and 2001, that the discovery requested was too burdensome, that Relator's counsel had the data to complete the analysis ourselves,[38] and that our requests asked for a legal conclusion.[39]

---

[35] Doc. 219, Declaration of J. Tyler Robinson, Exhibit A.
[36] Exhibit L (March 10, 2011, Letter from Rob Rice to David Nadler).
[37] Exhibit M (April 6, 2011, Letter from Rob Rice to David Nadler).
[38] CDW-G's contention that Relator's counsel possessed the information to conduct the analysis presents a good example of CDW-G's habit of stating facts depending on the situation in which it finds itself. Its current Motion *in*

Thus, for the second time, CDW-G refused to answer the question posed.  CDW-G contends that the sale of a non-trade-compliant item might not actually violate the TAA---even though TAA compliance is a term in the contract---for certain sales.  Relator's counsel asked CDW-G to identify each of those sales.  CDW-G has identified no such sales.

Thereafter, CDW-G witness Sheryl McCurnin (the CDW-G employee responsible for GSA Contract Administration) effectively repeated the same thing---that there "might" be times where the GSA Contract requirement for TAA compliance did not have to be followed.  After this testimony, Relator's counsel sent yet another letter asking CDW-G to identify the individual sales where this was actually the case.  CDW-G has never answered that last letter, which is not a surprise given that, to date, the only answer CDW-G has to the allegation that it sold non-TAA compliant items to the United States is to dissemble and obfuscate. The instant motion *in limine* is more of the same.

The truth of the matter is actually undisputed:  For each of its sales to the Federal Government, CDW-G has identified a "price code" for that sale.  For each "price code," CDW-G has identified whether compliance with the TAA is a term in the contract associated with that "price code."  Dr. Albright's summary charts very simply identify all sales where:  (a) the "price code" is associated with a contract calling for TAA compliance; and (b) the sale is for a product that was not made in a trade-compliant country.

CDW-G contends that the identified sales "might" not have required TAA compliance--- that a "transaction by transaction" analysis is needed.  This is an illusory defense.  Relator asked CDW-G to identify such transactions.  CDW-G has identified none.  There is therefore no evidence to support CDW-G's claim in this regard. In the end, this Court needs only to consider

---

*Limine* categorically denies that Albright possessed the data necessary to undertake this analysis.
[39] Exhibit N (April 18, 2011, Letter from David Yang to Rob Rice).

whether the function of compiling data and performing (but not creating) queries---and compiling such information into well-explained summary charts---constitutes an "opinion" or is more akin to the product of a calculator. Relator contends that Dr. Albright had no *choice* in the matter. He was provided information, told what to do, and he followed directions. To the extent choice was involved, that was limited to the type of software program he would use and the format of the tables that would reflect the outcome of his work. He will not opine on the TAA. He will not opine on whether CDW-G's sales of non-trade-compliant goods actually amounted to violations of the TAA. TAA compliance testimony will, instead, be offered by Relator's GSA expert, Neal Fox. Mr. Fox will offer opinion testimony about, among other things, the propriety of selling non-trade compliant goods to the United States. Again, CDW-G has not raised any issue with the accuracy of Albright's data compilation and summaries, nor has it moved to exclude the testimony of Mr. Fox.

Should the Court determine that Dr. Albright's work constitutes an "opinion", he is unquestionably qualified to have undertaken these software exercises by education, specialized knowledge, and experience.[40] In light of the fact that Albright's compilation will permit a jury to quickly understand and digest three discrete data sets involving millions of transactions, his work would be obviously helpful to a jury. This is exactly the purpose of Fed.R.Evid. 1006. Since Albright is both qualified and helpful, the Court should certainly receive and consider his testimony.[41]

## IV.    CONCLUSION

Dr. Albright compiled summary charts of data for this Court and the jury to consider. Fed.R.Evid. 1006 explicitly permits such charts. The information contained in the summaries

---

[40] *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005).
[41] *United States v. Winbush*, 580 F.3d 503, 510 (7th Cir. 2009).

derived from CDW-G's discovery responses and Relator's counsel have explained to CDW-G, in the most transparent means available, how the data was analyzed and the charts prepared. Albright performed a clerical task in comparing data and making summary charts and he did so by following parameters established exclusively by Liotine's counsel.

CDW-G's Motion in Limine deliberately misconstrues the purpose for which Dr. Albright was retained. CDW-G pretends that Dr. Albright is offering expert opinions that he has not and will not offer and ignores the existence of Relator's other expert, Neal Fox, who CDW-G all but concedes is qualified to offer opinions about TAA compliance. Albright has nothing to say about the intricacies of the TAA, or about how government contracting works, or about CDW-G's responsibilities and duties to Federal Government customers. In the end, CDW-G does not take issue with the single dataset composition, the manner in which he merged the data, or the queries he constructed. CDW-G has raised no objection to any of these things and offered no expert to rebut his methodology in analyzing the data. CDW-G's Motion *in Limine* should be denied.

Respectfully Submitted,

_____/s/ Dale J. Aschemann_____
Dale J. Aschemann, Illinois Bar #6269347
ASCHEMANN KELLER LLC
300 North Monroe Street
Marion, Illinois 62959-2326
Telephone: (618) 998-9988
E-mail: DaleA@quitamlaw.org

James B. Helmer, Jr. OHSBA # 0002878
Paul B. Martins, OHSBA #0007623
Robert M. Rice, OHSBA #0061803
HELMER, MARTINS, RICE &
POPHAM CO., L.P.A.
600 Vine Street, Suite 2704
Cincinnati, Ohio 45202
Telephone: (513) 421-2400

E-mail: support@fcalawfirm.com

***Attorneys for Relator Joe Liotine***

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **The United States Of America,** | ) | |
| ex rel., Joe Liotine, individually, | ) | |
| | ) | **CASE NO.:  05-cv-33-DRH** |
| **Plaintiff(s),** | ) | |
| | ) | **CJRA TRACK:  C** |
| **vs.** | ) | |
| | ) | **JUDGE: David R. Herndon** |
| **CDW-Government, Inc.** | ) | |
| An Illinois corporation, | ) | |
| | ) | |
| **Defendant(s).** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of November 2011, I electronically filed **Relator's Memorandum in Opposition to Defendant CDW-Government, Inc.'s Motion *In Limine* to Exclude the Data Analysis and Testimony of Jeremy Albright** with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

- **Gerald M. Burke**
  gerald.burke@usdoj.gov; sandra.carr@usdoj.gov; donna.gerdes@usdoj.gov;
  USAILS.SDILCiv@usdoj.gov

- **J. Andrew Jackson**
  jacksona@dicksteinshapiro.com

- **Candice C. Kusmer**
  ckusmer@kbslf.com; amcdaniel@kbslf.com

- **David M. Nadler**
  nadlerd@dicksteinshapiro.com

- **David Y. Yang**
  yangd@dicksteinshapiro.com

ASCHEMANN KELLER LLC


By:   /s/ Dale J. Aschemann

Dale J. Aschemann
Attorney for Relator

Aschemann Keller LLC
 Dale J. Aschemann #6269347
 Timothy Keller #6225309
 Tyler Robinson #6302860
300 North Monroe Street
Marion, Illinois  62959-2326   (618) 998-9988
Facsimile  (618) 993-2565
E-Mail:  dalea@quitamlaw.org