**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**UNITED STATES OF AMERICA,
ex rel. JOE LIOTINE, individually,**

**Plaintiff,**

**v.**

**CDW GOVERNMENT, INC.,
an Illinois corporation,**

**Defendant.**                                                    **No. 05-33-DRH**

**<u>AMENDED ORDER</u>**[1]

**HERNDON, Chief Judge:**

     Plaintiff, relator Joe Liotine, brought two counts against his former employer, defendant CDW Government, Inc. ("CDW-G"), under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), alleging that CDW-G engaged in fraudulent conduct in connection with its sales to the General Sales Administration ("GSA") and that CDW-G retaliated against relator for investigating CDW-G's conduct. Both parties have moved for summary judgment on relator's false claims count, and CDW-G has moved for summary judgment on relator's retaliation claim. There are also three evidentiary motions pending: 1) CDW-G's motion in limine to exclude the data analysis and

---

[1]On July 9, 2012, the Court received an email from the government requesting the Court to consider amending its order filed on July 3, 2012 (Doc. 269), in order to correct some typographical type errors. The Court has reviewed those suggestions and revised its order to correct those errors. Therefore, the order filed on July 3, 2012 (Doc. 269), is vacated, and replaced with this order.

testimony of Dr. Jeremy Albright; 2) CDW-G's motion in limine to exclude the expert testimony of Keith Withycombe; and 3) CDW-G's motion to strike exhibit O, a PowerPoint presentation.  For the reasons that follow, the evidentiary motions are denied, CDW-G's motion for partial summary judgment on count I (Doc. 222) is granted in part and denied in part, relator's motion for summary judgment as to CDW-G's affirmative defenses (Doc. 218) is granted in part and denied in part, relator's motion for partial summary judgment (Doc. 216) is denied, and CDW-G's motion for partial summary judgment on count II (Doc. 220) is denied.

## I.  Background

On January 19, 2005, relator filed a two count complaint against CDW-G pursuant to the FCA.  Count I alleges that CDW-G engaged in fraudulent conduct in connection with its sales to the GSA.  Specifically, under count I relator alleges that defendant charged the government for shipping when the contracts provided for free shipping, overcharged the government for other shipping rates, overcharged the government by failing to offer the "most favored customer" pricing as required by the contract, failed to remit the proper amount of Industrial Funding Fee ("IFF"), sold items to the government even though CDW-G was not an authorized seller, and sold non-trade compliant items.  Count II alleges that CDW-G retaliated against relator in violation of the FCA.

In his complaint, relator alleges that he worked for CDW-G from March 20, 1997, to July 7, 2001, as a customer service representative, shipper, and sales representative (*Id*. at ¶7).  Relator, acting as a sales representative, received and filled

purchase orders from government agencies, including the GSA and U.S. Mint (*Id*. at ¶ 8).   The government contracts with defendant provided free ground shipping and reduced expedited shipping for both the GSA and U.S. Mint (*Id*. at ¶ 38).   Relator claims that CDW-G and its sales representatives, in order to maximize its gross profits, increased the price of products being sold to the GSA.   Defendant further charged the GSA for shipping costs and increased expedited shipping costs (*Id*. at ¶ 46-61).   Further, CDW-G also increased shipping costs on items sent to U.S. Mint. (*Id*. at ¶¶ 63-67).    Relator alleges that U.S. Mint was continually overcharged for shipping over the course of two years (*Id*.).    During the Spring of 2001, relator alleges that defendant began withholding IFF from the GSA by failing to determine the shipments were being sent to the GSA through their computer software (*Id*. at ¶¶ 49-52).   Relator further alleges that he has knowledge of the fraudulent statements and actions towards the government and is the original source of those allegations (*Id*. at ¶ 10).   Relator alleges that while employed by defendant, he began contacting Simon Fritz of U.S. Mint regarding the actions defendant was committing against U.S. Mint (*Id*. at ¶¶ 32-33).

In count II, relator alleges that he was fired for his attempts to provide evidence to the government regarding CDW-G's fraudulent activities.   Specifically, he claims that his manager, Bob Rossi, instructed him to take advantage of certain purchasers at U.S. Mint.   Relator claims that shortly after this, he approached Rossi and told him that he did not think it was right to take advantage of these purchasers and that he thought it was wrong the way CDW-G was defrauding the government on

shipping, insurance, returns, etc.  Relator asserts that Rossi responded that relator should not make such accusations and that relator should consider whether relator really knew what he was talking about.  Shortly after this conversation, relator claims that he began having inexplicable scheduling problems and that consequently relator would miss or be tardy to training.  This resulted in relator being written up and after three "write ups," relator was suspended from work for a week.  The gist of these allegations is that relator was being set up to be fired.

Relator also alleges that after he began questioning CDW-G's alleged illegal sales practices and stopped following CDW-G's directions, Rossi became verbally abusive, and when relator similarly responded, he was taken to Chris Rother's office to be terminated; relator was not terminated, however, after divulging the substance of the exchanges.  Relator further contends that he called Simon Fritz of U.S. Mint and told Fritz to begin scrutinizing defendant's prices.  Relator claims that Fritz requested a spreadsheet of the items U.S. Mint had purchased from defendant, but relator was told not to give this information to U.S. Mint.  Relator asserts that he ignored these instructions and emailed Fritz the information anyway.  After this, relator claims that he knew he was about to be discharged and in order to inform other purchasers of the actions CDW-G was taking to defraud them, relator copied the names and phone numbers of the accounts in his system and emailed them to himself.  Relator alleges that defendant began questioning him about what he knew and what information he had given to the government.  Thereafter, he was terminated.  He claims that defendant told him that if he did not sign a form

containing defendant's description of why he was terminated he would not receive full payment/compensation of what CDW-G owed him.

Following the filing of the complaint, the United States began investigating relator's claims and on February 19, 2008, filed a notice with the Court indicating that it would not intervene at that time but that its investigation would continue. (Doc. 38).  The United States also requested that should either relator or defendant propose that this action be dismissed, settled, or otherwise discontinued, the Court solicit the written consent of the United States before ruling or granting its approval. (Doc. 38).  On February 21, 2009, CDW-G filed a motion to dismiss count I of relator's complaint, and on September 29, 2009, the Court entered an ordered denying that motion.  (Doc. 100).

On November 7, 2011, several motions for summary judgment were filed by the parties.  Relator filed a motion for partial summary judgment, and a motion for summary judgment as to defendant's affirmative defenses (Doc. 218).  Defendant filed a motion for partial summary judgment on count I of relator's complaint (Doc. 222), and a motion for summary judgment on count II of relator's complaint (Doc. 220).  Defendant also filed a motion in limine to exclude the data analysis and testimony of Dr. Jeremy Albright (Doc. 224), a motion in limine to exclude the expert testimony of Keith Withycombe (Doc. 226), and a motion to strike exhibit O to relator's memorandum in support of relator's motion for partial summary judgment (Doc. 228).  Pursuant to CDW-G's request (Doc. 256), the Court held oral argument on the motions.  The Court will now rule on each motion.

## II.  Analysis

Because the Court's rulings on the evidentiary motions may impact how the Court rules on the motions for summary judgment, the Court will address those motions first, followed by the motions for summary judgment.

*A.  CDW-G's motion in limine to exclude the data analysis and testimony of Dr. Jeremy Albright (Doc. 224)*

CDW-G filed a motion in limine to exclude the data analysis and testimony of Dr. Jeremy Albright (Doc. 224), contending that the three reports offered by Dr. Albright are peppered with expert opinions, are based on missing and fabricated data and mistaken assumptions, and because Dr. Albright has no personal knowledge of the underlying information.  Therefore, CDW-G posits that Dr. Albright's reports and testimony should be excluded.  Relator responds by arguing that Dr. Albright is not being offered for expert testimony and that his reports are explicitly permitted by Federal Rule of Evidence 1006.  In light of relator's response, CDW-G filed a reply contending that the Dr. Albright's reports are not admissible under Rule 1006 because they are not based on accurate records that are admissible in evidence.

Rule 1006 provides that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  FED. R. EVID. 1006.  "The provision, however, is not an end around to introducing evidence that would otherwise be inadmissible; therefore, in applying this rule, we require the proponent of the summary to demonstrate that the underlying records are accurate and would be

admissible as evidence." *United States v. Oros*, 578 F.3d 703, 708 (7th Cir. 2009)

(citing *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d

371, 382 (7th Cir. 2008)).   One way to do this is through the business records

exception.

"It is well established that computer data compilations are admissible as

business records under [Federal Rule of Evidence] 803(6) if a proper foundation as

to the reliability of the records is established."  *United States v. Briscoe*, 896 F.2d

1476, 1494 (7th Cir. 1990) (citing *United States v. Croft*, 750 F.2d 1354, 1364 (7th

Cir. 1984)).   Rule 803(6) provides that the following is not excluded by the rule

against hearsay:

> (6) *Records of a Regularly Conducted Activity*.  A record of an act,
> event, condition, opinion, or diagnosis, if:
> (A) the record was made at or near the time by–or from information
> transmitted by– someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity
> of a business, organization, occupation, or calling, whether or not for
> profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by testimony of the custodian or
> another qualified witness, or by a certification that complies with Rule
> 902(11) or (12) or with a statute permitting certification;
> (E) neither the source of information nor the method or circumstances
> of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6).  "While Rule 803(6) does not require that the qualified witness

be the person who prepared the record, [citation], or that the witness have personal

knowledge of the entries in the records, [citation], the business records exception

does require that the witness have knowledge of the procedure under which the

records were created, [citation]."  *Collins v. Kibort*, 143 F.3d 331, 337-38 (7th Cir.

1998).

Here, Dr. Albright produced three reports using CDW-G's own sales records, country of origin information, definitions of price codes, and other information Dr. Albright has been able to obtain from CDW-G.  Thus, it appears that Dr. Albright is using CDW-G's business records as a "summary, chart, or calculation to prove the content of voluminous . . . recordings . . . that cannot be conveniently examined in court," the exact purpose behind Rule 1006.  See FED. R. EVID. 1006.  Thus, if plaintiff can meet the requirements of Rule 803(6) by laying the proper foundation and reliability of the records underlying Dr. Albright's reports, then the evidence will be admissible at trial.  Dr. Albright can authenticate his evidence by describing the process he used and showing that it produces an accurate result.  See FED. R. EVID. 901(b)(9) ("*Evidence About a Process or System*.  Evidence describing a process or system and showing that it produces an accurate result.").  The fact that the reports may reflect missing or fabricated data or mistaken assumptions goes to the weight accorded the reports and not to their admissibility.  The witness is subject to cross examination on this point.

As to CDW-G's arguments that Dr. Albright's reports are peppered with expert opinions, the Court understands Dr. Albright to be an expert in order to accomplish the task he was asked to complete, i.e., to use his specialized computer knowledge to summarize data within the parameters that have been given to him.  He will not, however, give expert testimony; rather, he will only testify about the evidence he compiled from the exhibits, which will be in evidence and are from CDW-G.  This

evidence does not require peer reviewed scientific analysis or extrapolation. Dr. Albright is just a witness qualified by knowledge, skill, experience, training, or education to input data and then explain the results. Dr. Albright is not opining on the meaning of those results; rather, he is just reporting what he found and the jury can assess for itself what it means. To the extent that Dr. Albright's testimony may qualify as expert testimony, regarding how he gathered the information for his testimony, under the framework of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Court finds that his testimony qualifies for admission under Federal Rule of Evidence 702. See *Roback v. V.I.P. Transport, Inc.*, 90 F.3d 1207, 1215-16 (7th Cir. 1996) (finding testimony documenting the malfunctioning of a vehicle by gathering and compiling data during a test run qualified for admission under Rule 702 where the expert used standard components to assemble his computerized data acquisition system, could have been interrogated about the way in which his software worked, and where his data was subject to examination and independent verification). Accordingly, CDW-G's motion in limine to exclude the data analysis and testimony of Dr. Albright (Doc. 224) is denied.

B. *CDW-G's motion in limine to exclude the expert testimony of Keith Withycombe (Doc. 226)*

In CDW-G's motion in limine to exclude the expert testimony of Keith Withycombe (Docs. 226 & 227), CDW-G argues that relator is prohibited from calling Withycombe as an expert witness in this matter because government regulations prohibit Withycombe from testifying as an expert witness on behalf of relator and

because all applicable rules bar Withycombe from testifying as an expert witness for relator.   Relator responds by arguing that the GSA *Touhy*[2] regulations do not prohibit relator from calling Withycombe as an expert witness and that none of CDW-G's other arguments for excluding the testimony of Withycombe have merit.  Relator further contends that *Touhy* has already been satisfied by CDW-G itself, that even if the GSA had not already produced Withycombe, the balance of authority holds that *Touhy* regulations do not authorize exclusion of otherwise relevant evidence from actions in federal court, and that CDW-G has no standing to preclude Withycome's testimony.  Because the Court agrees with this latter argument, the Court need not address the other arguments raised on this point.

In *United States v. Fidelity & Deposit Co. of Md.*, 986 F.2d 1110 (1993),  the defendant argued that the district court erred in not excluding the testimony of two Army personnel because their appearances as witnesses violated Army regulations, particularly the requirement that Army personnel obtain written permission from the Department of the Army prior to giving expert opinion testimony at trial.  On appeal, the Seventh Circuit found it important to note "that the Army [was] not attempting to enforce the regulation in order to prevent its personnel from testifying in private litigation." *Id.* at 1118.  Instead, the court recognized that it was presented with the

---

[2]The term "*Touhy* regulations" derives from the Supreme Court's decision in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951), where the Supreme Court held that subordinate federal officials could not be held in contempt for failing to comply with a court order that was converse to a valid federal regulation.  See *Edwards v. U.S. Dept. of Justice*, 43 F.3d 312, 316-17 (7th Cir. 1994).

"rather unusual situation in which a private litigant . . . [was] attempting to enforce
Army regulations in litigation in which the Army [was] not a party and ha[d] no
interest." *Id.*  Accordingly, before determining whether the Army personnel's
testimony violated the Army regulations and were erroneously admitted at trial, the
court determined that the defendant, as a private party, did not "have standing to
claim a violation based upon the provisions at issue." *Id.* at 1119.  The court found
that "[w]hile it is true that the regulation recites that the Department of the Army
'maintains strict impartiality in private litigation' and states that 'conflicts of interest
are to be avoided,' [citation] . . . [the court did] not believe that the regulation, when
read as a whole, [could] be interpreted to protect [the defendant's] interest." *Id.*  The
court elaborated further by stating:

> Indeed, this entire section of the Code of Federal Regulations is
> designed to provide the Army with a single, centralized method of
> dealing with litigation, both public and private, in which the military
> service might be asked to play a role.  The Department of the Army has
> stated that the regulations are meant to prescribe "policy and
> procedures for the representation of the Department of the Army and
> its personnel in civilian court proceedings," as well as the "prosecution
> of offenses committed on military installations; and the release of
> information and appearances of witnesses in criminal and civil court
> actions." [Citation].  None of these goals is intended to benefit private
> litigants.

*Id.*

Similar to the Army regulations in *Fidelity & Deposit Co. of Md.*, the
regulations at issue here provide in relevant part:

> An employee shall not serve, other than on behalf of the United States,
> as an expert witness, with or without compensation, in any proceeding
> before a court or agency of the United States in which the United States
> is a party or has a direct and substantial interest, unless the employee's

participation is authorized by the agency under paragraph (c) of this section.

5 C.F.R. § 2635.805(a).   Paragraph (c) of that section provides as follows:

> Provided that the employee's testimony will not violate any of the principles or standards set forth in this part, authorization to provide expert witness service otherwise prohibited by paragraphs (a) and (b) of this section may be given by the designated agency ethics official of the agency in which the employee serves when:
> (1) After consultation with the agency representing the Government in the proceeding or, if the Government is not a party, with the Department of Justice and the agency with the most direct and substantial interest in the matter, the designated agency ethics official determines that the employee's service as an expert witness is in the interest of the Government; or
> (2) The designated agency ethics official determines that the subject matter of the testimony does not relate to the employee's official duties within the meaning of § 2635.807(a)(2)(I).

*Id.* at (c).   Paragraph (d) provides that "[n]othing in this section prohibits an employee from serving as a fact witness when subpoenaed by an appropriate authority. " *Id.* at (d).

Based upon these regulations, CDW-G maintains that Withycombe is prohibited from testifying as an expert witness on behalf of relator because he has not obtained permission from the appropriate government entity to do so.   Like in *Fidelity & Deposit Co. of Md.*, however, the Court finds that CDW-G, a private party, lacks standing to claim a violation of the regulations at issue. *Id.* at 1119.   CDW-G has provided the Court with nothing to persuade it that the regulations at issue here were intended to benefit private litigants, and not just the United States.   Thus, CDW-G lacks standing to pursue this claim, and the motion to exclude the expert testimony of Withycombe (Doc. 226) is denied.

Page 12 of  42

Nevertheless, the Court sees no reason why relator cannot comply with the Code of Federal Regulations at issue here prior to trial.  Accordingly, relator is ordered to obtain authorization from the designated agency ethics official of the agency in which Withycombe serves prior to testifying at trial.  See *Ueland v. United States*, 291 F.3d 993, 999 (7th Cir. 2002) (requiring the trial court to comply with 5 C.F.R. § 2635.805 on remand).

*C.  CDW-G's motion to strike exhibit O to relator's memorandum in support of his motion for partial summary judgment (Doc. 228)*

CDW-G filed a motion to strike exhibit O – CDW-G's PowerPoint presentation used in settlement discussions with the Department of Justice – to relator's memorandum in support of his motion for partial summary judgment contending that it is precluded by Federal Rule of Evidence 408.  Relator contends that the PowerPoint presentation is offered to show that CDW-G had knowledge of the GSA audit, yet offered no evidence to rebut it.

Rule 408 does not permit the admission of evidence of settlement or compromise to prove liability for a claim or its amount.  *Alexander v. Int'l Assoc. of Prof'l Fire Fighters, Local 357*, 120 F.3d 723, 728 (7th Cir. 1997).  Despite this, evidence arising from settlement negotiations has been admitted by courts to show the bias or prejudice of a witness, for purposes of rebuttal and impeachment, to show knowledge and intent, to show a continuing course of reckless conduct, and to prove estoppel.  *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 689 (7th Cir. 2005).  "In deciding whether Rule 408 should be applied to exclude evidence,

courts must consider the spirit and purpose of the rule and decide whether the need for settlement evidence outweighs the potentially chilling effect on future settlement negotiations." *Id.* "The primary policy reason for excluding settlement communications is that the law favors out-of-court settlements, and allowing offers of compromise to be used as admissions of liability might chill voluntary efforts at dispute resolution." *Id.* "The balance is especially likely to tip in favor of admitting evidence when the settlement communications at issue arise out of a dispute distinct from the one for which the evidence is being offered." *Id.* "The district court has broad discretion to admit evidence for a purpose other than proving liability[.]" *Id.*

The PowerPoint presentation at issue here was prepared by CDW-G for the Department of Justice in response to relator's allegations and the audit that the GSA conducted. In the presentation, CDW-G disagreed with and disputed the Department of Justice's assumptions used in its audit and argued that the Department of Justice could not meet its burden of proof to prove a violation of the False Claims Act. CDW-G then explained its methodology using the same statistical sample as the GSA and showed its results.

At the pleading stage, CDW-G tried to have the presentation struck but the Court concluded that the presentation was not being offered to prove liability but rather to demonstrate relator's position that he met the fraud pleading requirements of Federal Rule of Civil Procedure 9(b). Now relator would have the Court believe that the presentation is not being used to show CDW-G's liability, but is being offered to show that CDW-G had "knowledge" of the GSA audit, yet proffered no evidence to

rebut it.  The Court finds that relator can use it for this limited purpose.

Indeed, looking to the spirit and purpose of Rule 408, the Court concludes that admitting evidence of the PowerPoint would not chill voluntary efforts of dispute resolution because CDW-G does not admit its liability in the presentation.  In fact, CDW-G vehemently denies its liability.  Nevertheless, the Court directs relator to redact any reference to settlement or compromise discussions in the presentation and forbids relator from making any argument that the presentation somehow proves CDW-G's liability or its amount.  Relator is permitted to use the presentation only to show CDW-G's knowledge of the GSA audit.  Thus, CDW-G's motion to strike exhibit O to relator's memorandum in support of his motion for partial summary judgment is denied (Doc. 228).

### D.  Motions for Summary Judgment

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. PROC. 56(c).  A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant.  *Buscaglia v. United States,* 25 F.3d 530, 534 (7th Cir. 1994).  The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial.  FED. R.

CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  "[T]he substantive law will identify which facts are material and only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Fanslow v. Chi. Manuf. Ctr., Inc.*, 384 F.3d 469, 478 (7th Cir. 2004).

In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  Only admissible evidence may be considered when deciding motions for summary judgment.  *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009).  In opposing summary judgment, the relator cannot rest on the allegations in the pleadings, but is required to present evidentiary material which, if reduced to admissible evidence, may allow him to carry his burden of proof.  *United States v. Yannacopoulos*, 652 F.3d 818, 823 (7th Cir. 2011).  FCA cases often turn heavily on the facts.  *Fanslow*, 384 F.3d at 473.

*1.  CDW-G's motion for partial summary judgment on count I (Doc. 222)*

In its complaint, relator alleged a number of fraudulent schemes committed by CDW-G, but in defendant's motion for summary judgment on count I, defendant categorized those allegations into three claims: 1) CDW-G's Trade Agreements Act ("TAA"), 19 U.S.C. § 2501 *et seq.*, violations; 2) CDW-G's ground shipping and IFF violations; and 3) CDW-G's other violations.  In its response, relator states that he "does not intend to pursue these other forms of wrongdoing as independent bases

for liability.  Relator therefore does not oppose CDW-G's motion as it relates to liability for the matters address[ing CDW'G's other violations]."   Accordingly, summary judgment is granted in favor of defendant as to those claims, and the Court will only address relator's claims related to the TAA and the alleged shipping and IFF violations.

At issue in this case is whether CDW-G knowingly presented a false or fraudulent claim for payment or approval to the government.  See 31 U.S.C. § 3729(a)(1)(A).   The term "knowingly" means that "a person, with respect to information" "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information."  *Id.* at (b)(1)(A).  Specific intent to defraud is not required.  *Id.* at (b)(1)(B).  "Under the Act, private individuals . . . referred to as 'relators,' may file civil actions known as qui tam actions on behalf of the United States to recover money that the government paid as a result of conduct forbidden under the Act."  *Yannacopoulos*, 652 F.3d at 822 (citing *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 912 (7th Cir. 2009)).  "As an incentive to bring suit, a prevailing relator may collect a substantial percentage of any funds recovered for the benefit of the government."  *Yannacopoulos*, 652 F.3d at 822 (citing *Glaser*, 570 F.3d at 912).  "To establish civil liability under the False Claims Act, a relator generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false."  *Yannacopoulos*, 652 F.3d at 822.

"Innocent mistakes or negligence are not actionable under this section." *Hindo v. Univ. of Health Scis.*, 65 F.3d 608, 613 (7th Cir. 1995). "'What constitutes the offense is not intent to deceive but knowing presentation of a claim that is either fraudulent or simply false. The requisite intent is the knowing presentation of what is known to be false.'" *Id.* (quoting *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1420 (9th Cir. 1991)). "In short, the claim must be a lie." *Hindo*, 65 F.3d at 613 (citing *Wang v. FMC Corp.*, 975 F.2d 1412, 1416 (9th Cir. 1992)).

     *a. TAA*

     The GSA schedule entered into between CDW-G and the government generally does not permit the sale of end products from non-designated countries.[3] Relator contends that CDW-G promised to comply with the TAA and sell only goods from trade-compliant countries, but CDW-G's own sales database shows that CDW-G regularly failed to do so. CDW-G contends that relator has not identified a single false claim for payment and as a result this claim must fail. CDW-G argues that unable to meet his evidentiary obligations head on, relator points to Albright's report for supposed evidence of false claims under the TAA, but CDW-G contends that this approach fails because Albright's report is clearly inadmissible, and even if

---

     [3]The relevant provision provides as follows: "The Contractor agrees to deliver under this contract only U.S. made end products, designated country end products, Caribbean Basin country end products, Canadian end products or under section 302 of the Trade Agreements Act of 1979, nondesignated country end products. Only if such waiver is granted may a nondesignated country end product be delivered under this contract (s)." (Doc. 232-10).

admissible, it fails to assist relator.   CDW-G also argues that relator has not

demonstrated any damages in connection with his TAA claims.  Realtor contends that

through the summary charts compiled in the Albright supplement report, he has

identified thousands of invoices for non-trade compliant goods that were sold to the

government pursuant to government contracts that required TAA compliance.  With

regard to CDW-G's damages argument, relator contends that defendant's contention

directly conflicts with Seventh Circuit precedent which applies a more lenient "but

for" standard when assessing damages.   The United States filed a statement of

interest contending that "[u]nder prevailing Seventh Circuit precedent . . . the proper

measure of FCA damages is what the government paid."  (Doc. 246).  The United

States offered no position on the remaining issues.  CDW-G filed a reply to the United

States' statement of interest, disputing the government's contentions.  (Doc. 253).

Here, construing all facts and drawing all inferences in relator's favor, as the

Court must, the Court finds that relator's TAA claims survive CDW-G's motion for

partial summary judgment.   Indeed, relator's own deposition testimony raises a

genuine issue of material fact as to whether CDW-G made a knowingly false statement

to the government in order to receive money.  See *Payne v. Pauley*, 337 F.3d 767,

773 (7th Cir. 2003) ("We hope this discussion lays to rest the misconception that

evidence presented in a 'self-serving' affidavit is never sufficient to thwart a summary

judgment motion.   Provided that the evidence meets the usual requirements for

evidence presented on summary judgment–including the requirements that it be

based on personal knowledge and that it set forth specific facts showing that there

is a genuine issue for trial–a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts."). In his deposition, relator testified that he had personal knowledge that CDW-G knowingly shipped orders in violation of the TAA, specifically Tektronix products and HP backup tapes. (Doc. 244-17, p. 8). This, combined with Dr. Albright's reports, at a minimum raises a genuine issue of material fact as to whether CDW-G made a knowingly false statement to the government in order to receive money. In fact, in each of his reports, Dr. Albright found that CDW-G sold millions of dollars worth of goods from non-designated countries purportedly in violation of the TAA. Accordingly, CDW-G's motion for summary judgment on the TAA claims is denied.

At to whether relator can demonstrate damages in connection with the TAA claim, CDW-G argues that "because [relator] cannot show diminished value in any good from a non-designated country that was sold and kept for use by the [g]overnment, he cannot demonstrate that any item is worth less than what the [g]overnment paid," and "[a]s such, there are no damages for [relator's] claim." Relator contends that "damages can be shown if the [g]overnment would not have paid the claims 'but for' the false claims submitted–here, false claims that CDW-G's products complied with the TAA." The government asserts that "[u]nder controlling case law in this Circuit, when a contractor violates a core pre-condition for payment like the TAA that relates directly to the contractor's eligibility to supply a particular good or service, nothing is due to the contractor, regardless of whether goods or services were provided, and the resulting measure of damages to the United States

is the full value of any amount paid out by the government."

In *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008), the United States filed an action under the FCA against the principal manager and financial beneficiary of a medical center who conspired to defraud the United States by concealing the fact that many patients came to the medical center only because of referrals that violated the Stark Amendment to the Medicare Act, 42 U.S.C. § 1395nn, and the Anti-Kickback Act, 42 U.S.C. § 1320a-7b.  In short, the medical center paid physicians, who were criminally charged and plead guilty, for patients rather than for medical services in violation of the Stark Amendment which forbade federal reimbursement for services that stem from compensated referrals.  After a bench trial, the district court found that the defendant "knew about these shenanigans (and may have orchestrated them), and ordered him to pay a total of $64 million and change."  *Id.* at 452.

On appeal, the Seventh Circuit made short order of defendant's argument "that most of the patients for which claims were submitted received some medical care–perhaps all the care reflected in the claim forms."  *Id.* at 453.  The Seventh Circuit explained as follows:

> The government offers a subsidy (from the patients' perspective, a form of insurance), with conditions.  When the conditions are not satisfied, nothing is due.  Thus the entire amount that [the medical center] received on these 1,812 claims must be paid back.  Now it may be that, if the patients had gone elsewhere, the United States would have paid for their care.  Or perhaps the patients, or a private insurer, would have paid for care at [the medical center] had it refrained from billing the United States.  But neither possibility allows [the defendant] to keep money obtained from the Treasury by false pretense, or avoid the

penalty for deceit.

*Id.* Thus, the Seventh Circuit upheld the $64 million ($17 million in false claims trebled, penalty added, and reduced by restitution paid) in damages assessed to the defendant. *Id.*

Here, as in *Rogan*, absent some exception, compliance with the TAA is a precondition that must complied with before a sale is permitted. Thus, if it is proven that CDW-G knowingly sold the government products in violation of the TAA, then the correct measure of damages would be the entire amount paid for those products. Otherwise, the United States may not sustain any damages for knowing violations of the TAA other than the civil penalty. Indeed, the fact that the goods are purchased from a non-compliant country does not in itself mean that the goods are of any less quality or value, but that is not the interest that the TAA is designed to protect. The TAA's purposes are "(1) approve and implement the trade agreements negotiated under the Trade Act of 1974; (2) to foster the growth and maintenance of an open world trading system; (3) to expand opportunities for the commerce of the United States in international trade; and (4) to improve the rules of international trade and to provide for the enforcement of such rules, and for other purposes." 19 U.S.C. § 2502. These purposes cannot be accomplished if a party who has come to an agreement with the United States to abide by the TAA and only sell from compliant countries is allowed to knowingly sell from non-compliant countries. CDW-G is not entitled to keep money obtained from the government under false pretenses. See *Rogan*, 517 F.3d at 453.

### b. Shipping/IFF

It is undisputed that CDW-G is required to pay an IFF to GSA, which is a percentage-based administrative fee (1% of sale price in this case), for any sales made under the GSA schedule, and is required to provide free ground shipping to government customers or a discounted rate if the customer requests expedited shipping. Relator contends that an expert GSA auditor found that CDW-G regularly failed to do these things. CDW-G contends that this claim must fail because relator has no evidence of fraud. Further, CDW-G argues that reliance on Withycombe's findings to establish damages in connection with his IFF and freight allegations dooms his claims because those findings simply demonstrate a mere difference in opinion between CDW-G and the GSA over a matter of contract interpretation, a claim relator lacks standing to pursue (breach of contract claims are not actionable by relators, only fraud actions). Relator disputes this, contending that he is not required to have first-hand knowledge of all the evidence needed to prove his claim and that relator has offered the GSA audit as undisputed evidence identifying false claims and quantifying the amount of damages done to the government. As to CDW-G's argument that the GSA audit involves a matter of contract interpretation and therefore relator lacks standing to bring a breach of contract claim, relator argues that the GSA audit does not involve "contract interpretation" at all, but rather is a clear application of the undisputed terms between the GSA and CDW-G and provides evidence of CDW-G's violations of those clear contract terms.

Here, Withycombe testified in his deposition that out of the approximate 1000

invoice sample set he reviewed, at least one item on the invoice or order was not reported to GSA approximately 10% of the time. (Doc. 244-3, p. 9). Withycombe testified that "[w]e determined that there was unpaid IFF and overcharges on freight." (Doc .244-3, p. 14). Relator testified that a $3 million printer and the Wyse terminal order were shipped as GSA orders but were subsequently shipped with shipping pricing. (Doc. 244-17, p. 5). He also described orders that were shipped under a contract with U.S. Mint that were shipped with shipping charges that were not supposed to be charged. (Doc. 244-17, p. 5). Relator testified that CDW-G "knowingly" shipped orders that were marked as GSA orders, but had shipping charges on them that were not supposed to be there, and that orders were sold at the GSA price but not selected as GSA orders. (Doc. 244-17, p. 6).

Construing this evidence in relator's favor and drawing all reasonable inferences therefrom, leaves genuine issues of material fact as to whether CDW-G knowingly made a false statement to the government with regard to the shipping and IFF claims. Accordingly, CDW-G's motion for summary judgment on count I (Doc. 222) with regard to the shipping and IFF claims is denied. As stated above, summary judgment is granted in favor of CDW-G as to all claims except the TAA and the alleged shipping and IFF violations.

### 2. Relator's motion for partial summary judgment (Doc. 216)

In relator's motion for partial summary judgment plaintiff contends "there is no dispute of fact on two matters in this litigation: (1) [CDW-G] submitted false claims to the [g]overnment from 1999 through 2003 that overcharged for shipping

or that caused underpaid GSA funding fee payments; and (2) These false claims resulted in $1,860,149.93 in damages to the United States."  Plaintiff concedes that the jury will have to determine whether CDW-G "knowingly" submitted these false claims.  CDW-G responds by arguing that plaintiff has alleged only a mere breach of contract which does not amount to a false claim under the FCA, that plaintiff's motion confirms that he has no evidence of a knowing violation by CDW-G in any event, and that Withycombe's audit does not demonstrate violations by CDW-G or damages.

Here, these matters are clearly in dispute and this motion is denied.  Relator suggests that the results of Withycombe's audit is the end-all be-all for the first two elements of its FCA claim, but that simply is not true.  There are genuine disputes of material fact with regard to Withycombe's audit, including the assumptions on which it was based and the results it produced.  As Withycombe explained in his deposition, he did not make any determination as to whether CDW-G's action rose to the level of fraud; he just tried to determine whether or not there was harm to the government based on relator's allegations. (Doc. 244-3, p. 14).  Withycombe did this based upon the confines of the sample he was given.  CDW-G used a different analysis and came up with different results in its rebuttal to Withycombe's audit. (Doc. 244-3, p. 18).  The jury will determine whether relator has proved (1) that CDW-G made a statement in order to receive money from the government, (2) that was false, and (3) that CDW-G knew it was false. *Yannacopoulos*, 652 F.3d at 822. Accordingly, relator's motion for partial summary judgment (Doc. 216) is denied.

### 3.   *Relator's motion for summary judgment as to CDW-G's affirmative defenses (Doc. 218)*

Relator contends that CDW-G's summary judgment should be granted with respect to all fourteen of defendant's affirmative defenses.  First, relator contends that defendant's affirmative defenses should be stricken because defendant has omitted any factual basis and has failed to set forth the necessary elements of its defenses.  Second, relator argues that defendant has improperly invoked the defenses of waiver, estoppel, and laches because relator contends that those equitable affirmative defenses are not available against the United States, the real party in interest.  Lastly, relator argues that defendant's fifth and ninth affirmative defenses relating to whether relator sufficiently plead or proved that the United States suffered damages as a result of the matters alleged in relator's complaint should be dismissed because the United States need not suffer damages to state a viable FCA violation.  CDW-G responds by arguing that relator's request that CDW-G's affirmative defenses be stricken should be denied because it is a really a Federal Rule of Civil Procedure 12(f) motion to strike which is untimely and because defendant properly plead its affirmative defenses in any event.  Alternatively, CDW-G contends that relator has failed to demonstrate an absence of genuine issues of material fact regarding any of defendant's affirmative defenses.

CDW-G raised the following fourteen affirmative defenses in its answer: 1) "[r]elator has failed to state a claim upon which relief can be granted"; 2) "[t]he claims are barred by the doctrine of estoppel, laches, waiver, release, accord and

satisfaction"; 3) "[t]he claims are barred by the applicable statute of limitations"; 4) "[r]elator has failed adequately to plead violations of law in that, while the [c]omplaint purports to identify certain payments, it does not allege how those payments were in violation of the specific terms and conditions set forth in contracts between the United States and the [d]efendants and/or to allege fraud with respect to these matters with particularity"; 5) "relator has failed to adequately plead damages[,]" and "[t]he damages [r]elator seeks are too indefinite to be compensable"; 6) [r]elator's claims against [d]efendant are barred because [d]efendant has complied with all applicable regulations of the federal and state governments"; 7) "[r]elator's claims are barred, in whole or in part, because [d]efendant's statements or actions were not the proximate cause or cause in fact of any injury or alleged loss"; 8) "relator fails to state with particularity facts to support the fraud and fraud-based allegations against [d]efendant contained in the [c]omplaint"; 9) "[r]elator's claims against [d]efendant are barred, in whole or on part, because the United States suffered no damages as a result of the matters alleged in the [c]omplaint"; 10) "[r]elator's claims under the [FCA] are barred because [d]efendant did not act with the requisite intent"; 11) "[r]elator's claims against [d]efendant are barred, in whole or in part, because [d]efendant's conduct as alleged in the [c]omplaint was not material to any alleged payment of any alleged false or fraudulent claims"; 12) "[r]elator's claims against [d]efendant are barred, in whole or in part, because the United States did not rely on [d]efendant's conduct as alleged in the [c]omplaint"; 13) "[r]elator's claims are offset and reduced by [d]efendant's overpayments of [IFF] and under-charging of freight";

and 14) "[d]efendant hereby gives notice that it intends to rely upon any other and additional defense that is now or may become available or appear during, or as a result of the discovery proceedings in this action and hereby reserves the right to amend its answer to assert such defense." (Doc. 44).

Federal Rules of Civil Procedure 8(c) requires affirmative defenses to be raised in the pleadings. FED. R. CIV. P. 8(c); *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005). "The purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it." *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005). An affirmative defense is to be litigated at summary judgment or at trial. *Marshall v. Knight*, 455 F.3d 965, 969 n. 2 (7th Cir. 2006). "Affirmative defenses will be stricken only when they are insufficient on the face of the pleadings." *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989). "Ordinarily, defenses will not be struck if they are sufficient as a matter of law or if they present questions of law or fact." *Id.* Defenses must "state in short and plain terms its defenses to each claim asserted against it[.]" FED. R. CIV. P. 8(b); *Heller Fin., Inc.*, 883 F.2d at 1294.

First, the Court considers CDW-G's argument regarding whether relator's motion for summary judgment as to CDW-G's affirmative defenses is really a Federal Rule of Civil Procedure 12(f) motion to strike which should be denied as untimely. Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" "on its own" or "on motion made by a party either before responding to the pleading or, if

a response is not allowed, within 21 days after being served with the pleading." FED.

R. CIV. P. 12(f). The Court finds that CDW-G's classification of relator's motion is

immaterial as the Court has unrestricted authority to strike insufficient defenses.

*Id.*; *United States v. 416.81 Acres of Land*, 514 F.2d 627, 630 n. 3 (7th Cir. 1975).

Moreover, the Supreme Court and the Seventh Circuit have acknowledged that

dismissal of affirmative defenses may be properly raised in a motion for summary

judgment. See *United States v. Bailey*, 444 U.S. 394, 413 n. 9 (1980) ("In a civil

action, the question whether a particular affirmative defense is sufficiently supported

by testimony to go to the jury may often be resolved on a motion for summary

judgment, but of course motions for summary judgment are creatures of civil, not

criminal, trial."); *Brownmark Films, LLC v. Comedy Partners*, No. 11-2620, 2012

U.S. App. LEXIS 11454, at *10-11 (7th Cir. June 7, 2012) ("The district court could

properly consider an affirmative defense in the context of a motion for summary

judgment, which it did here, regardless of the caption SPDS used."); *Certain*

*Underwriters of Llyod's & Cos. Subscribing to Excess Aviation Liab. Ins. Policy No.*

*FL-10959 A & B v. Gen. Accident Ins. Co. of Am.*, 909 F.2d 228, 231 (7th Cir. 1990).

Thus, this argument fails.

As to the merits of relator's arguments, relator has the burden of

demonstrating the absence of a genuine issue of material with regard to each of CDW-

G's affirmative defenses. Relator asserts that CDW-G has provided nothing more

than "bare bones conclusory" affirmative defenses that should be stricken as legally

insufficient. Relator further suggests that defenses of waiver, estoppel, and laches

should be dismissed as those defenses are not available against the United States, the real party in interest. Lastly, relator argues that the fifth and ninth affirmative defenses should be dismissed because the United States need not suffer damages to state a viable FCA action.

With regard to relator's first contention that CDW-G's affirmative defenses are nothing more than legally insufficient conclusory allegations, the Court finds that CDW-G has stated "in short and plain terms its defenses to each claim asserted against it." See FED. R. CIV. P. 8(b). Moreover, if relator truly believed these defenses were insufficient on their face, relator should have filed a motion to strike these defenses within twenty-one days after served with the pleading. See FED. R. CIV. P. 12(f). If the Court decided to strike CDW-G's defenses now on this basis, the Court would grant CDW-G leave to amend its defenses considering how late in the game relator has decided to raise this argument. See FED. R. CIV. P. 15(a). Going through that process would be an exercise in futility and a waste of resources. CDW-G has sufficiently raised its affirmative defenses and can attempt to prove the ones that survive this motion at trial.

Relator further suggests that defenses of waiver, estoppel, and laches should be dismissed as those defenses are not available against the United States, the real party in interest. "[A]lthough the United States is not a 'party' to a *qui tam* suit unless it intervenes, it is nonetheless a real party in interest–which is to say that its financial interests are at stake." *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 852 (7th Cir. 2009). A violation of the rights of the United States may

not be waived by the unauthorized acts of its agents.  See *Fed. Crop Ins. Corp. v. Merrill*, 322 U.S. 380, 384 (1947) ("Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."); *Ferguson v. Fed. Deposit Ins. Corp.*, 164 F.3d 894, 896-99 (5th Cir. 1999) (affirming summary judgment that defendant's affirmative defense of waiver was not available against United States where an employee acts outside the scope of the authority).  Moreover, estoppel is generally not a defense against the government, although there may be some situation where it is appropriate.  *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 420-21 (1990); *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984). Furthermore, "[i]t is well settled that the United States is not . . .subject to the defense of laches in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416 (1940); *Silverman v. Commodity Futures Trading Comm'n*, 549 F.2d 28, 34 (7th Cir. 1977).

Here, relator has established as a matter of law that the affirmative defenses of waiver, estoppel, and laches are not available against the United States.  Thus, summary judgment is entered in favor of relator as to those defenses and CDW-G will not be permitted to try and prove those defenses against the United States at trial.

Lastly, relator argues that the fifth and ninth affirmative defenses should be dismissed because the United States need not suffer damages to state a viable FCA action.  "A false claim is actionable under the Act even though the United States has

suffered no measurable damages from the claim." *United States v. Hughes*, 585 F.2d 284, 286 n. 2 (7th Cir. 1978) (citing *Fleming v. United States*, 336 F.2d 475, 480 (10th Cir. 1964)). This is because the United States can rely solely on the forfeiture provision. *Id.* at 286; 31 U.S.C. § 3729(a). Thus, proving damages is not an essential element to relator's claim and these affirmative defenses fail as a matter of law. Accordingly, CDW-G will not be allowed to try and prove these defenses at trial. And while not argued by relator, the Court finds that CDW-G's eighth affirmative defense, the failure to plead fraud with particularity, has already been rejected by this Court in CDW-G's motion to dismiss. (Doc. 100). Therefore, relator's motion for summary judgment as to CDW-G's affirmative defenses (Doc. 218) is denied in part and granted in part. CDW-G can attempt to prove the affirmative defenses raised in its answer at trial with the exception of the estoppel, laches, and waiver defenses raised in its second affirmative defense, and the defenses raised in its fifth, eighth, and ninth affirmative defenses.

### 4. CDW-G's motion for partial summary judgment on count II (Doc. 220)

In CDW-G's memorandum in support of its motion for partial summary judgment on count II, CDW-G contends that relator can offer no evidence to support any – much less all – of the elements of a retaliation claim. First, CDW-G argues that relator cannot show that he was engaged in conduct protected by the FCA. Second, CDW-G contends that relator did not give notice to CDW-G of any potential litigation. Lastly, CDW-G posits that relator cannot show that his termination was motivated in any part by protected conduct. Relator counters by arguing that CDW-G has

ignored two of relator's affidavits containing facts material to the circumstances of his discharge, and that "[s]imilarly, [r]elator's [i]nitial [d]isclosures pursuant to Rule 26[] identified witnesses Simon Fritz, Gini Troddy, and Ron Harrigall as persons with information that [r]elator might use to support his claims."  Relator asserts that his affidavits describe in detail how these individuals were witnesses to the protected conduct, yet CDW-G "did not take the depositions of these individuals nor undertake any other discovery which would undermine [relator's] sworn factual assertions." Relator contends that these "affidavits, alone, require denial of this [m]otion." Relator also points to his deposition testimony as support for his position that CDW-G's motion for summary judgment should be denied.

In 1986 Congress amended the FCA by adding subsection (h) to provide for "whistleblower" protection.  *Fanslow*, 384 F.3d at 479.  That section now provides as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h).  "A plaintiff may proceed under subsection (h) independently of a qui tam action."  *Fanslow*, 384 F.3d at 479 (citing *Neal v. Honeywell Inc.*, 33 F.3d 860, 865 (7th Cir. 1994)).  At the summary judgment stage, the relator must present evidence supporting the following elements: 1) the relator's actions were

Page 33 of  42

taken "in furtherance of" an FCA enforcement action and were therefore protected by the statute; 2) the relator's employer had knowledge that he was engaged in this protected conduct; and 3) the relator's discharge was motivated, at least in part, by the protected conduct. *Fanslow*, 384 F.3d at 479 (citing *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002)).  The Court will address each element in turn.

a. *Protected Conduct*

"The term 'protected activity' is interpreted broadly, in light of the purpose of the statute." *Fanslow*, 384 F.3d at 479.  "An employee need not have actual knowledge of the FCA for her actions to be considered 'protected activity' under § 3730(h)." *Id.* at 479.  "Congress intended to protect employees from retaliation while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together."  *Id.* at 481 (citing *Neal*, 33 F.3d at 864).  "[T]he relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether: '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" *Id.* at 480 (quoting *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002)).  "The statute does not, however, protect an employee who just imagines fraud without proof." *Fanslow*, 384 F.3d at 481.

Here, the Court finds that relator has presented enough evidence to create a genuine issue of material fact as to this element of his claim.  Relator's affidavit and

deposition testimony support his theory that he had a "good faith" belief that CDW-G was committing fraud against the government.   For example, relator presented evidence indicating that he told Rossi that he thought it was wrong the way CDW-G was cheating on shipping, insurance, returns, etc.   Further, relator testified in his deposition that Chris Rother took him out to lunch to discuss his concerns about CDW-G overcharging customers for shipping and how federal sales representatives were charged for this shipping, and his questioning of Todd Favakeh and Rossi about these practices.   See *Fanslow*, 384 F.3d at 481-82 (recognizing that while the Seventh Circuit has "not explicitly held that internal complaints constitute protected conduct," "there are sound reasons for finding that internal complaints are protected" and on remand "the district court should consider whether [relator's] actions were the type of internal complaints protected by the FCA.") (citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 742 (D.C. Cir. 1998)). Relator also testified that he started contacting Simon Fritz with U.S. Mint in May and June of 2001 so that he could tell him about how he was being overcharged, and that he emailed the names and phone numbers of his accounts so that he could show the government this information.   Moreover, a question of fact exists as to whether a reasonable employee in the same or similar circumstances might believe that CDW-G was committing fraud against the government. Thus, relator has presented enough evidence on this matter to survive summary judgment.

     *b. Notice*

     Relator next must demonstrate that his protected conduct put CDW-G on

notice of the distinct possibility of a qui tam action. *Fanslow*, 383 F.3d at 483 (citing *Brandon*, 277 F.3d at 945). "[A] retaliatory complaint must be dismissed if the employer did not know about the whistle-blower's protected conduct before it discharged him." *Fanslow*, 383 F.3d at 483 (citing *Luckey*, 183 F.3d at 733). There is a heightened notice requirement for employees who are charged with investigating fraud. *Fanslow*, 383 F. 3d at 484 (citing *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 867-68 (4th Cir. 1999)). So called "fraud-alert" employees may be expected to use words like "illegal" or "unlawful" when sharing their concerns with their employer, but employees with no such reporting or investigatory duties are not required to use any magic words to put their employer on notice. *Fanslow*, 383 F. 3d at 484.

In this case, relator stated in his affidavit that he approached Rossi and told him that he did not think that it was right "to take advantage of these black purchasers." Relator also claims that he told Rossi that he thought it was wrong the way CDW-G was cheating on shipping, insurance, returns, etc., and that Rossi responded that he did not need to be making these kinds of accusations and that relator should really consider whether he really knew what he was talking about. Relator alleges that shortly thereafter he was "warned about talking about true or untrue statements that management had made to the federal purchasers concerning purchasing contracts, particularly with respect to return policies and storage facilities." Relator claims that "[s]hortly after this conversation with Rossi[], [he] began having inexplicable scheduling problems: [he] would return from training only

to find that the schedule had been changed to reflect that [his] training was on a different day and [his] printed schedules were also taken down out of [his] cubicle." "For instance, Annette Arnold (who worked on state and local side) and [relator] would take lunch before training, go have training and return to work.  Upon returning, [relator's] training time had been changed therefore making [him] tardy from work.  Conversely, [relator] would miss product training because [his] work schedule would be changed.  To prove [he] was correct, [relator] would refer to the company intranet only to find that [his] training time slot had been changed." Relator claims that "[a]s a result of instances like this, [relator] kept being written up and, after three times in a row, they suspended [him] for a week."  Relator concludes that "[e]ssentially, [relator] was suspended for missing training classes that were scheduled at the same time as important conference calls with Purchasing Contractors of the IRS."  He stated that "[o]nly when [he] started questioning [Rossi] about certain sales practices did [he] begin getting written up for being late.  And in those instances it was clear to [relator] that the work schedule had been deliberately changed to catch [him] in a scheduling mix-up.  Rossi[] took [his] 'tardiness' issue to his immediate boss, Brett Schmidt and wrote [him] up.  After [he] made waves and quit following CDW-G's sales directions, Rossi[] became verbally abusive and would call [relator] a 'bitch' or 'pussy' for complaining."  Relator concluded that "[t]here was no question that [he] was harassed by management as a result of approaching them with the fraud they had been practicing and by stating that [he] would not participate in their schemes to defraud the government."

In his deposition, relator testified that Chris Rother took him out to lunch to discuss relator's concerns about overcharging customers for shipping and how federal sales representatives were charged for this shipping, and his questioning of Todd Favakeh and Kramer Rossi about practices.  Relator testified that they also talked about some "write-ups" that he had received which he disagreed with and he "told her that those write-ups were in response to [him] sharing information with sales reps" that CDW-G did not want him to share.

Relator alleges in his affidavit that "[a]s the abuse grew, [he] snapped back at Rossi[] and was taken to Chris Rother's office to be terminated.  In this meeting [relator] divulged what was going on with Rossi[] and how serious of an issue it was that [he] was being messed with. [Relator] was not terminated or written up at that time."  Relator further asserts that he was labeled a "non team player" when he questioned methods to achieve gross profit margins and was segregated from other employees when it appeared that he was informing others of the fraud taking place. Relator claims that "[a]fter noticing that certain accounts were slowly being taken way from [him] without [his] knowledge, [he] knew that [he] was going to be terminated because [he] would not agree to do what management wanted [him] to do.  In short, [he] knew at that time that [his] days at CDW-G were numbered."

Relator claims that "[s]hortly thereafter, [he] called Simon Fritz of the Mint and told him to begin scrutinizing [CDW-G's] prices. [He] told him to 'check out our pricing; I don't think we're competitive.'  Finally Fritz called [relator] and said what he needed was a spreadsheet of everything the Mint had purchased from CDW,

part#, price, etc.  There was also a smaller amount of Microsoft products contained

on a second spreadsheet that [he] sent to the credit card purchase group at the Mint.

[He] was subsequently reprimanded for sending that spreadsheet."  "Regarding the

first spreadsheet, Chris Rother flatly refused to provide it because Fritz would see

that [CDW-G] weren't in the top percentage (top 3 to top 5) on C-Net."  Relator states

that he "was later reprimanded for supplying the Federal Government with their own

order and/or invoice history. [He] was told that [he] should not give the government

any information and that if they wanted such information, they could/should get it

themselves off the extranet."  Relator claims that he "subsequently ignored these

instructions and e-mailed Simon Fritz with more information."  In his deposition,

relator testified that he started contacting Fritz in May and June of 2001 so that he

could tell him about how he was being overcharged.

"Finally, knowing [he] was about to be discharged and in order to inform other

purchasers of the actions CDW-G was taking to defraud them, [he] copied the names

and phone numbers of the accounts that [he] had in [his] system and emailed them

to a personal address in order to have evidence to show the Federal Government.

[Relator] then used [his] wife's work station to download the list of customers to

contact."  "CDW-G management questioned [relator] about the information that [he]

had given to the Federal Government and to what issues [he] had alerted the feds.

They also met me off-site to find out what [he] really knew about company

procedures and questioned how [he] knew some of the information [he] possessed."

Relator asserts that when he "was terminated and forced to sign a document

containing [CDW-G's] description of why [he] was terminated[, he] was 'forced' in that [CDW-G] said [he] would not receive full payment/compensation for what they owed [him] if [he] did not sign the form."

Here, it is undisputed that relator was not a "fraud-alert" employee. Thus, relator had no reporting or investigating duties and was not required to use any magic words to put CDW-G on notice of the distinct possibility of a qui tam action. Construing all the evidence in favor of relator and against defendant as the Court must, the Court finds that questions of fact exist as to whether CDW-G was on notice of the distinct possibility of a qui tam action. To rule otherwise would result in the Court making a credibility determination that is within the province of the jury.

c. *Relator's Discharge*

Lastly, relator must demonstrate that his discharge was motivated, at least in part, by the protected conduct. *Fanslow*, 383 F. 3d at 485 (citing *Brandon*, 277 F.3d at 944). "Once the plaintiff has made this showing, 'the burden of proof shifts to the employer to prove affirmatively that the same decision would have been made even if the employee had not engaged in protected activity.'" *Fanslow*, 383 F. 3d at 485 (citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 n. 4 (D.C. Cir. 1998)).

Here, at a minimum relator's affidavit and deposition testimony which were set forth in the previous discussion regarding notice shift the burden to CDW-G to prove affirmatively that relator would have been discharged even if relator had not engaged in the protected activity. While CDW-G's coworker feedback and counseling form

dated July 2, 2001, signed by relator, indicates that relator was discharged for violating company rules, specifically relator "had confidential information forwarded to a personal email address," Rossi testified that relator was discharged for a multitude of issues, "from stealing from other account managers to bad behavior to not showing up for scheduled events and not completing work duties."   Relator disputes that these were the reasons for his discharge, and asserts that he began to be set up to be fired after discussing with Rossi his concerns about the way CDW-G was charging.   Relator further testifies that he began being "harassed by management as a result of approaching them with the fraud they had been practicing and by stating that [he] would not participate in their schemes to defraud the government." Relator claims that he knew he was going to be terminated and as a result began to contact Simon Fritz of U.S. Mint about the fraud and that he sent himself account contact information in violation of company policy so he would have that information to turn over to the government.   He says the reason he signed the termination form was because he was told he would not receive full payment of his compensation until he did.

Based upon this evidence, there are clearly material questions of fact, and CDW-G has failed to meet its burden to prove that relator would have been fired regardless of whether he engaged in the protected activity.   Indeed, CDW-G did not provide any evidence to establish that even if relator's allegations were true, relator would have been fired anyway.   Accordingly, it would be improper to enter summary judgment against relator on this point as well, and CDW-G's motion for partial

summary judgment on count II (Doc. 220) is denied.

### III. Conclusion

For the reasons stated above, CDW-G's motion in limine to exclude the data analysis and testimony of Dr. Jeremy Albright (Doc. 224), CDW-G's motion in limine to exclude the expert testimony of Keith Withycombe (Doc. 226), CDW-G's motion to strike exhibit O (Doc. 228), relator's motion for partial summary judgment (Doc. 216), and CDW-G's motion for partial summary judgment on count II (Doc. 220) are denied. CDW-G's motion for partial summary judgment on count I (Doc. 222) and relator's motion for summary judgment as to CDW-G's affirmative defenses (Doc. 218) are granted in part and denied in part.

**IT IS SO ORDERED.**

Signed this 10th day of July, 2012.

Digitally signed by David R. Herndon
Date: 2012.07.10
13:07:21 -05'00'

**Chief Judge**
**United States District Court**