**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| U.S.A. *ex rel*. JOE LIOTINE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No.: **3:05-cv-00033-DRH-PMF** |
| | ) | |
| CDW-GOVERNMENT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

**FRAZIER, Magistrate Judge:**

Before the Court are Relator Joe Liotine's motions for attorney fees (Docs. 299, 301) and Defendant CDW-Government, Incorporated's ("CDW-G") response (Doc. 307) thereto. For the following reasons, it is recommended that Liotine's (Docs. 299, 301) motions for attorney fees be granted in the amounts set forth below.

**A. Motions for Attorney Fees**

Relator Joe Liotine has filed two motions for attorney fees (Docs. 299, 301) seeking recovery of reasonable attorney fees pursuant to 31 U.S.C. § 3730(d) and $3730(h). This False Claims Act case has settled for 7 million dollars. The parties agree that Liotine's counsel is entitled to reasonable attorney fees. They disagree, however, as to the reasonableness of the fees requested by Liotine.

Determining the so-called reasonableness of an attorney fee could appear to be a vague and ambiguous task. In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983), the U.S. Supreme Court developed an objective approach, commonly referred to as "lodestar," to aid in the calculation of reasonable attorney fees. Lodestar calculates the number

of hours reasonably expended on the litigation multiplied by a reasonable hourly rate, and aims to provide "an objective basis on which to make an initial estimate of the value of a lawyer's services." *Hensley*, 461 U.S. at 433. "[T]he lodestar method produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 130 S. Ct. 1662, 1672, 176 L. Ed. 2d 494 (2010) (emphasis added). It "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." *Id*. The parties agree that the lodestar method is appropriate in this case.

### 1. Reasonable Rates

In 2004, Relator Joe Liotine initially sought counsel in the Chicago area, where he resided. He was ultimately referred to the firm of Aschemann Keller, L.L.C. ("Aschemann firm") in Marion, Illinois, which is located in the southern part of Illinois. Dale J. Aschemann filed the complaint in this case on January 19, 2005. In 2008, the United States filed a notice pursuant to the False Claims Act that it was not intervening in this case. *See* Doc. 38. Sometime thereafter, CDW-G hired a Washington, D.C.-based law firm Dickstein Shapiro, L.L.P. ("Dickstein Shapiro"), which boasts a specialty in False Claims Act litigation and significant litigation resources. In an effort to obtain more litigation resources, the Cincinnati, Ohio law firm of Helmer, Martins, Rice and Pophamco, L.P.A. ("Helmer firm"), which also has a specialty in False Claims Act litigation, joined forces with Aschemann firm shortly thereafter to prosecute this case on behalf of Liotine. The Aschemann and Helmer firms have jointly-prosecuted this case to present day and have filed separate petitions for attorney fees. *See* Docs. 299, 301.

2

a.  *Helmer Firm (Docs. 299-300, 313).*

The Helmer firm has requested attorney fees as follows:

| Name | Hours | Rate/Hour | Total |
|------|-------|-----------|-------|
| James B. Helmer, Jr. (Lead Partner) | 247.60 | $600.00 | $148,560.00 |
| Paul B. Martins (Senior Partner) | 78.10 | $525.00 | $41,002.50 |
| Robert M. Rice (Senior Partner) | 2,922.45 | $525.00 | $1,534,286.25 |
| James A. Tate (Associate) | 1.20 | $295.00 | $354.00 |
| Jennifer Lambert (Senior Associate) | 164.05 | $390.00 | $63,979.50 |
| Erin M. Campbell (Associate) | 17.80 | $380.00 | $6,764.00 |
| Jennifer P. Pomerantz (Paralegal) | 900.25 | $175.00 | $157,543.75 |
| William J. Diggs II (Paralegal) | 5.75 | $155.00 | $891.25 |
| Dayna Boatright (Paralegal) | 6.25 | $175.00 | $1,093.75 |
| | **4,343.45** | | **$1.954,475.00** |

*See* Doc. 300-1 at 14 ¶ 50; 300-2 at 104.  In support of its request, the Helmer firm has submitted the declaration of James B. Helmer, Jr. that details the credentials of the individuals employed by the Helmer firm and the work those employees have performed in this case. *See* Doc. 300-1. With respect to rates, Helmer testifies that the above rates "are what we charge in False Claims Act cases." Doc. 300-1 at 11 ¶ 35.  Furthermore, the requested hourly rates "have been accepted by opposing counsel, the Department of Justice and by federal judges" in False Claims Act cases. *Id*. ¶¶ 34-35.  Helmer attests that his firm also does "other complex litigation (besides False Claims Act matters) for corporations," and the requested rates are "consistent with our rates that we currently charge and are paid by our hourly-fee paying clients in non-False Claims Act cases." *Id*. ¶ 35.  Helmer has also filed a supplemental declaration with Liotine's (Doc. 313) reply stating that the rates sought here are "the exact same hourly rates that we currently charge and are paid by hourly-paying clients." *See* Doc. 313-1 at 2.

In setting reasonable rates, the lodestar method "looks to 'the prevailing market rates in the relevant community.'" *Perdue*, 130 S. Ct. at 1672 (quoting *Blum v. Stenson*, 465 U.S. 886,

895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).  "The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate." *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1310 (7th Cir. 1996) (citing *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150 (7th Cir. 1993).  "Once an attorney provides evidence of his billing rate, the burden is upon the defendant to present evidence establishing 'a good reason why a lower rate is *essential*.'" *Id*. at 1313.  (quoting *Gusman*, 986 F.2d at 1151) (emphasis added).  "A defendant's failure to do so is essentially a concession that the attorney's billing rate is reasonable and should be awarded." *Id*.

CDW-G argues that the Helmer firm did not submit adequate evidence to support their request for attorney fees and cite to cases where a failure to support rates with third-party affidavits resulted in a reduction of a fee award. *See* Doc. 307 at 6 (citing *Blum*, 465 U.S. at 895 n.11 and *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011).  It is true that in some cases an "attorney's self-serving affidavit alone cannot satisfy the plaintiff's burden of establishing the market rate for that attorney's services." *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 556 (7th Cir. 1999) (citing *Blum*, 465 U.S. at 895 n. 11).  In *Spegon*, the Seventh Circuit considered the situation where an attorney, *who had no fee paying clients*, was unable to shift the burden of proof to the defendant to come forward with evidence that the plaintiff's requested rate was reasonable. *See id*.  Because the plaintiff's attorney in *Spegon* did not have fee paying clients or any other evidence, such as third-party affidavits, to establish that the requested rates were the market rates for someone of the plaintiff attorney's experience, the Seventh Circuit determined that the burden never shifted to the defendant to come forward with evidence that lower rates were essential. *See id*.  Unlike the plaintiff's attorney in *Spegon*, the Helmer firm has an actual billing rate and hourly fee-paying clients for comparable work. *See id*. (...since

[plaintiff's attorney] has no fee-paying clients, he has no "actual" billing rate that can be presumed to be his market rate-despite his assertions to the contrary. *See People Who Care*, 90 F.3d at 1310).

The Helmer firm's declarations are sufficient to establish its actual billing rate in this case. The evidentiary dispute here essentially comes down the literal interpretation (or the lacking applicability thereof) of footnote 11 of U.S. Supreme Court's decision in *Blum*, which recognized the inherent difficulty of establishing the market rate for an attorney's services. *See Blum*, 465 U.S. at 895 n. 11. In its entirety, footnote 11 reads as follows:

> We recognize, of course, that determining an appropriate "market rate" for the services of a lawyer is inherently difficult. Market prices of commodities and most services are determined by supply and demand. In this traditional sense there is no such thing as a prevailing market rate for the service of lawyers in a particular community. The type of services rendered by lawyers, as well as their experience, skill and reputation, varies extensively—even within a law firm. Accordingly, the hourly rates of lawyers in private practice also vary widely. The fees charged often are based on the product of hours devoted to the representation multiplied by the lawyer's customary rate. But the fee usually is discussed with the client, may be negotiated, and it is the client who pays whether he wins or loses. The § 1988 fee determination is made by the court in an entirely different setting: there is no negotiation or even discussion with the prevailing client, as the fee—found to be reasonable by the court—is paid by the losing party. Nevertheless, as shown in the text above, the critical inquiry in determining reasonableness is now generally recognized as the appropriate hourly rate. And the rates charged in private representations may afford relevant comparisons.
>
> In seeking some basis for a standard, courts properly have required prevailing attorneys to justify the reasonableness of the requested rate or rates. To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—*in addition to the attorney's own affidavits*—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate.

*Id*. (emphasis added). It must be recognized that *Blum* involved a case where the plaintiffs were represented by a non-profit legal aid firm. *Id*. at 890. The U.S. Supreme Court granted certiorari

to "consider whether it was proper for the District Court to use prevailing market rates in awarding attorney's fees to nonprofit legal services organizations and whether the District Court abused its discretion in increasing the fee award above that based on market rates." *Id*. at 892. Thus, the actual rates billed by the non-profit legal aid firm were not an issue in *Blum* and there was no discussion as to what standard applies to a fee petitioner who comes forward with a declaration stating exactly what rate it is paid by hourly fee-paying clients. The undersigned agrees with the Helmer firm's argument that the Seventh Circuit has developed an approach for establishing the appropriate market rates, and evidence of the prevailing market rate in the community (necessarily evidence beyond the fee petitioner's affidavit) is required only in the absence of evidence of the fee petitioner's actual billing rate.[1] *See* Doc. 313 at 2-3 (citing *Mathur v. Bd. of Trustees of S. Illinois Univ.*, 317 F.3d 738, 743 (7th Cir. 2003) (Only if an attorney is unable to provide evidence of her actual billing rates should a district court look to other evidence, including "rates similar experienced attorneys in the community charge paying clients for similar work." *People Who Care,* 90 F.3d at 1310). *See also Spegon*, 175 F.3d at 555.

The Helmer firm has met its burden in establishing that the requested rates are appropriate for the lodestar calculation, and the burden has shifted to CDW-G to come forward with a reason why a lower rate is essential. Much of the (Doc. 307) response is devoted to arguing what legal market should be used to establish the prevailing market rate in the relevant community for the Helmer firm. However, this analysis is not necessary in light of the fact that the Helmer firm has established its actual billing rate. *See People Who Care*, 90 F.3d at 1310 (citing *Blum*, 465 U.S. at 892, 895 n. 11); *Mathur*, 317 F.3d at 743. CDW-G has not submitted

---

[1] An affidavit or declaration from an attorney that testifies as to exactly what hourly rate clients actually pay should be distinguished from affidavit from an attorney who has no fee-paying clients and merely asserts that a requested rate is appropriate. The latter is the definition of "self-serving."

any persuasive reason why the presumption as to the reasonableness of the Helmer firm's requested rates should be overcome.   Therefore, the Court should use the Helmer firm's requested rates in its lodestar calculation.

      *b.  Ascheman Firm (Docs. 301-02, 312).*

The Aschemann firm has requested rates as follows:

| Name | Hours | Rate/Hour | Total |
|------|-------|-----------|-------|
| Dale Aschemann (Senior Partner) | 2,630.1 | $550 | $1,446,555.00 |
| Tim Keller (Senior Partner) | 203.1 | $550 | $ 111,705.00 |
| Tyler Robinson (Associate) | 200.1 | $350 | $ 70,035.00 |
|  | 3,033.3 |  | $1,628,295 |

Doc. 302-1 at 3 ¶ 11.   In support, the Aschemann firm offers the declaration of Dale J. Aschemann, who attests to the credentials and work performed by the three attorneys in the Aschemann firm seeking fees in this case. *See* Doc. 302-1.

      The Aschemann firm has not provided sufficient evidence regarding the actual billing rate charged to and paid by hourly fee-paying clients.   The Aschemann firm attests that they will be seeking the requested rates in this case and similar cases around the country. *See* Doc. 302-1 at 8-9 ¶ 33, 35.   It states that it has received "similar hourly rates" in other *qui tam* litigation around the country, but it is not able to divulge the specifics due to fees being awarded as part of settlement agreements. *See* Doc. 302 at 7 n. 24.   The Aschemann firm has presented evidence of a fee that it actually received in this district of approximately $650/hour for legal work that was performed in connection with complex federal litigation in which the attorneys of record received lodestar rates ranging from $350-$750 per hour. *See id*. ¶ 35 (citing *Burns v. IDFA Services, et al*., No 09-390 (S.D.Ill. 2009).   It appears that this fee was received just one time, the Aschemann firm attorneys were not the attorneys of record, and the work was not billed at the requested rates in this litigation.   Unlike the Helmer firm, the Court cannot conclude from the

evidence presented that the Aschemann firm's requested rate is its actual billing rate.  While the forgoing evidence is persuasive as to the reasonableness of a rate for the Aschemann firm, it is insufficient to establish that the requested rates are the firm's actual billing rates charged to and paid by hourly fee-paying clients for False Claims Act litigation or comparable work.

As noted above, the Court should now look to the next best evidence of the reasonable rate for the Aschemann firm-"the rate charged by lawyers in the community of 'reasonably comparable skill, experience, and reputation.'" *See People Who Care*, 90 F.3d at 1310 (quoting *Blum*, 465 U.S. at 892, 895 n. 11).  The Court need not look much further than this case to find the next best evidence of the appropriate rates for the Aschemann firm.  From an examination of the declarations, it would appear that Dale Aschemann and Tim Keller (senior partners) have similar skill, experience, and reputations to that of the senior partners of the Helmer firm.  The firms appear to have similar skillsets and similar quality of work when the filings of both firms are examined in this case.  The senior partners at the Helmer firm have established that they actually charge and are paid an hourly rate of $525/hour by hourly fee-paying clients.  The evidence described in previous paragraph is at least probative of the reasonable rate for the Aschemann firm, and $525/hour falls within the range it attests to requesting and receiving in various circumstances.  Further, the requested rate of $350/hour for associates in the Aschemann firm falls below the average rate that the Helmer firm charges for its associates.

To help establish a reasonable rate, the Aschemann firm has submitted the affidavit of attorney Ronald E. Osman, who is also a False Claims Act practitioner with substantial experience headquartered in southern Illinois. *See* Doc. 312-4.  He testifies that the normal and customary plaintiff billing rate for False Claims Act litigation is $400-$600 per hour. *Id*. at 3 ¶ 10.  Osman further attests to his familiarity with the Aschemann firm, and states that, aside from

his own and the Aschemann firm, no other firms in southern Illinois dedicate time and resources to False Claims Act relator representation. *See id*. ¶ 12. Osman concludes that he has personally observed the work of the Aschemann firm for a substantial period of time, and he believes that the Aschemann firm is entitled to rates of $575 per hour for partners and $350 per hour for associates.  This evidence should be given a fair amount of weight.

The Achemann and Helmer firms are in the same relevant False Claims Act community in terms of identifying the prevailing market rate in this case.  CDW-G argues that the relevant community in this case for the Aschemann firm is limited to just southern Illinois. *See* Doc. 307 at 7-8 (citing *Uphoff v. Elegant Bath, Ltd*., 176 F.3d 399, 407 (7th Cir. 1999)).  This argument is not persuasive.  The fact that the case was filed in the Southern District of Illinois is of little significance in this instance because it is alleged that CDW-G was defrauding agencies of the federal government.  Relator representation in False Claims Act litigation is a very specialized area of practice.  The Aschemann firm has submitted evidence that this case originated from a referral from the Chicago area.  These types of referrals from a large-market area to an attorney in a smaller locale almost never occur unless the attorney in the smaller locale is highly regarded and has a highly specialized practice.  Liotine's counsel has submitted evidence of False Claims Act cases that they are involved with across the country to add further support to the idea the False Claims Act relator representation is, essentially, a nationwide practice.  The idea that False Claims Act litigation may be a nationwide practice is further supported by the fact that CDW-G sought and obtained representation from Dickstein Shapiro, which is located in Washington, D.C.

While the Court does not necessarily need to conclude that the relevant community in this case consists of a national market (although it surely could), the Court should not have any

trouble concluding that the Aschemann firm and the Helmer firm are in the same relevant community for purposes of this litigation. Both firms claim a specialty in False Claims Act relator representation and have attorneys with similar skills, experience, and reputations. Both firms believed that representation of Liotine in this matter was an appropriate use of their respective firm's resources. And finally, for what it's worth, both firms are located in the same general geographic region of the United States.[2]

Finally, the parties disagree as to whether the Court should consider the rates that Dickstein Shapiro charges CDW-G for this case. As of February 28, 2013, those rates are: J Jackson (Partner) $750/hour, D Nadler (Partner) $740/hour, D Yang (Associate) $570, and D Gunn (Associate) $570/hour. Dickstein Shapiro argues that this comparison is apples to oranges because their rates are privately negotiated and it is "self-evident that the rates charged by large national defense firms that operate in some of the most expensive legal markets in the country such as New York, Los Angeles and Washington D.C., have no meaningful connection to the rates charged by a two-partner firm in smaller markets such as Marion, Illinois in the case of Aschemann Firm or a four-partner firm in Cincinnati, Ohio as in the case of the Helmer Firm."[3] Doc. 311 at 4. *See also* Doc. 307 at 7.

---

[2] As demonstrated by Major League Baseball's placement of the St. Louis Cardinals and the Cincinnati Reds in the Central division of the National League.

[3] The $750/hour rates charged by lead counsel for CDW-G is doubtlessly influenced by many things beyond the relative skills of the attorneys themselves. For example, the hourly rates charged by CDW-G attorneys Yang and Gunn, both **associates**, who to the undersigned's recollection had no participation in this case beyond research and motion preparation, each exceed the rates sought by Liotine's primary counsel and objected to as unreasonable by CDW-G. The care and feeding of such obviously talented associates and others like them must cost a bundle. The additional support and administrative staff plus rent, furniture, potted plants, etc. in the Washington, D.C. area plus other similar locales is likely a considerable amount and almost certainly is not a fixed cost experienced by the Helmer and Aschemann firms in their more austere milieus. Perhaps the apples-to-apples comparison CDW-G seems to seek would necessarily involve a protracted evidentiary hearing designed to separate the sizzle from the

The rates charged by CDW-G ultimately do have probative value as to the reasonableness of the rates charged by the Aschemann firm.  For some of the reasons that CDW-G has presented, Liotine's attorneys' hourly billing rates should not be set exactly to the rates that Dickstein Shapiro charges CDW-G.  However, it would not be too far off to suggest that a reasonable rate for Liotine's attorneys could approach the rates that Dickstein Shapiro's lead counsel bills its client.  CDW-G cannot escape the fact that Liotine's attorneys and CDW-G's attorneys have been practicing in the same case, in the same district court, and within the same highly specialized practice area.  It is the undersigned's observation of the proceedings that CDW-G's attorneys, while certainly talented and highly qualified, have not produced work that is superior in any way to that produced by Liotine's attorneys.  Once it is established that Dickstein Shapiro's work product has no qualitative edge over that of Liotine's attorneys, then the hourly rate negotiated in an arms-length transaction between Dickstein Shapiro and CDW-G takes on real significance.  CDW-G is undoubtedly managed by a very savvy and sophisticated group whose considered judgment as to what constitutes a reasonable hourly fee should be given great deference.  And recall, this is not a rate that Dickstein Shapiro is charging for work in another region or another type of case.  It is identical work in the identical case to Liotine's attorneys.  The issues and obstacles were the same for both sides.  The same law applies across the board.  If anything, the case is more difficult for Liotine because he is the plaintiff.

There is a striking amount of undeniable incredulity in CDW-G's suggestion that a reasonable rate for the Aschemann firm should be set at "$230 for partners and $170 for associates" (see Doc. 307 at 3, 5, 13) when Dickstein Shapiro's associates bill at a rate that is

---

steak where attorney fees are concerned.  The hearing would necessarily involve testimony from office managers and managing partners, along with accountants and others.  In other words, a first class dog and pony show.

148% higher than CDW-G's suggested rate for the Aschemann's firm's lead attorneys. Liotine's lead attorneys planned, executed, and carried out the prosecution of this case to a substantial result. Dickstein Shapiro's associate involvement appears to be limited primarily to the tasks of research and writing. The Court would have to be willfully blind to conclude that Dickstein Shapiro's rates in the same case for identical tasks have no bearing whatsoever on the reasonableness of the requested rates of Liotine's attorneys when associates, who typically have no case management responsibilities, bill at rate well beyond the rates suggested for the relator's lead attorneys.

For the forgoing reasons, a presumption has been established that lodestar rates of $525/hour for Dale Aschemann and Tim Keller (senior partners) and $350/hour for Tyler Robinson (associate) are reasonable in this case. The burden now shifts to CDW-G to come forward with an adequate reason why a lower rate is essential.

CDW-G submits evidence of what Kurowski Shultz, L.L.C. ("Kurowski firm"), a firm located in southern Illinois that serves as local counsel for CDW-G. *See* Doc. 307-1. The Kurowski firm charges CDW-G $230 an hour for partners and $170 an hour for associates. *See id*. CDW-G urges the Court to impose these rates upon the Aschemann firm. The Aschemann firm correctly points out that the evidence does not demonstrate that the Kurowski firm is similarly-situated in terms of specialization in False Claims Act litigation. The docket reflects that the Kurowski firm had relatively minor involvement in this case. The last docket entry reflecting work performed by the Kurowski firm was in February 2009. *See* Doc. 62. This firm has not participated since Dickstein Shapiro entered their appearances in the early stage of this case on February 6, 2009. *See* Docs. 66 *et al*. While CDW-G's evidence has some minute probative value, it is not enough to overcome the presumption

### 2.  Reasonable Hours

Liotine's counsel has requested 7,376.75 total hours to use as reasonable hours in the lodestar calculation.  CDW-G notes that Liotine bears the burden of demonstrating that their hours expended are reasonable, and it is not CDW-G's burden to demonstrate that they are excessive or unreasonable. *See* Doc. 307 at 14 n.10.  Lodestar factors in "billing judgment" in that an attorney seeking fees must exclude hours that would be excessive, redundant, or otherwise unnecessary. *Hensley*, 461 U.S. at 434 (Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.).  Both the Helmer firm and the Aschemann have affirmed in their declarations that they have attempted to adhere to this principle. *See* Doc. 300-1 at 12 ¶ 41; Doc. 302-1 at 2 ¶ 8.  They have submitted their detailed, billing statements in support of their request. *See* Docs. 300-2, 302-2.  The undersigned has reviewed the billing statements and finds that both statements sufficiently detailed down to a tenth of an hour and agrees that both the Helmer and Aschemann firms have exercised substantial billing judgment.  There being no apparent concerns with the hours submitted for the lodestar calculation, the Court finds that Liotine has met his burden regarding reasonableness and the burden will now shift to CDW-G to provide objections.

CDW-G begins by stating as follows:

CDW-G does not ask the Court to engage in a line-item review of the hours spent by Liotine's counsel.

Doc. 307 at 14.  Instead, it argues that the Court should reduce the total hours requested for all partner-level attorneys by 40%. *Id.*  In support of this request, CDW-G argues that 1) Liotine's billing statements are overly broad and vague, 2) time expended on first-to-file and relator fee-

sharing issues should've been excluded, 3) entries excessive duplicative efforts, and 4) clerical

work and travel should not be compensated at requested rates.

A 40% cut of all the hours submitted has not been sufficiently justified by CDW-G

because it has not provided clear and concise reason or sufficiently specific objections to support

such a "meat-axe" approach. "The district court must provide a clear and concise explanation for

its award, and may not 'eyeball' and decrease the fee by an arbitrary percentage because of a

visceral reaction that the request is excessive." *Schlacher v. Law Offices of Phillip J. Rotche &*

*Associates, P.C.*, 574 F.3d 852, 857 (7th Cir. 2009) (citing *Small v. Richard Wolf Med.*

*Instruments Corp.*, 264 F.3d 702, 708 (7th Cir. 2001); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566,

570 (7th Cir. 1992). The Seventh Circuit has specifically cautioned against taking the meat-axe

approach that CDW-G advocates here, explaining as follows:

> A district court facilitates appellate review by making specific findings en route to
> a fee calculation, and therefore we have reversed when we could not discern
> whether the district court arrived at its fee award by using the proper factors. *See*
> *[Eddleman v. Switchcraft, Inc.,* 927 F.2d 316, 317-20 (7th Cir.1991)].* But we
> need not automatically reverse a fee award in the absence of explicit findings
> about rates and hours. *See Small*, 264 F.3d at 709 (approving fee award lacking
> "detailed explanation" where district court simply accepted defendant's objections
> to billed time); *Henry v. Webermeier*, 738 F.2d 188, 193 (7th Cir. 1984)
> (explaining that there is no "Procrustean bed to which every fee proceeding must
> be fitted despite its actual dimensions"). When substantial fees are at stake, the
> district court must calculate the award with greater precision. *See Vukadinovich v.*
> *McCarthy*, 59 F.3d 58, 60 (7th Cir. 1995) (explaining that "proportioning of
> formality to stakes is a general principle of the law" that applies to attorney's fee
> awards); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 570 (remanding because district
> court made substantial cuts to $9 million fee request without sufficient
> explanation, but approving another court's "meat-axe approach" to fee petition in
> case where only $6,000 in fees were at stake); *Lenard v. Argento*, 808 F.2d 1242,
> 1247 (7th Cir. 1987) (explaining that less elaborate findings are required when a
> fee request is for "only a few hundred or a few thousand dollars").

*Id.* at 857-58. CDW-G has cited a Seventh Circuit case from 1986 involving an attorney fee

award of $6,000 in case that settled for $5,000 as support its argument for the meat-axe

approach. *See* Doc. 307 at 14 (citing *Tomazzoli v. Sheedy*, 804 F.2d 93, 98 (7th Cir. 1986)).  In contrast, it cannot be disputed that substantial fees are at stake in this case.  In light of that fact, the approach advocated by CDW-G is not warranted.  In order to broadly cut hours by 40%, CDW-G would have had to have explained exactly how it arrived at that specific figure.  There is no explanation.  Rather, the proposed cut appears to be base on the type of "visceral reaction" that the Seventh Circuit has specifically cautioned against. *See Schlacher*, 574 F.3d at 857.  For these reasons, the undersigned will only attempt to rule on specific objections that CDW-G has made to Liotine's billing statements.  All non-specific objections in the (Doc. 307) response are denied.

      a.   *Objection: Overly Broad and Vague Entries, Redactions for Privilege, and Block Billing Render Certain Claims Unsupportable*

As noted above, the Court has reviewed the billing statements and disagrees that the entries are overly broad or vague.  Although a lot of the entries are in fact not block-billed at all, CDW-G objects without citing sufficient examples of inappropriate block-billed entries.  The Seventh Circuit does not prohibit the practice of block-billing, *Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 569 (7th Cir. 2006), and without specific examples of what CDW-G objects to, the Court will not make specific findings.

      b.   *Objection: Time Expended on First-to-File and Relator Fee-Sharing Issues Should Be Excluded*

CDW-G argues that time should be excluded for time expended on first-to-file issues.  It states that "[i]n Liotine's counsel spent nearly 70 hours on collateral pursuits that had no bearing on the merits of the case." *See* Doc. 307 at 16.  CDW-G cites cases for support of its argument that collateral issues are not compensable.  But even if the Court was persuaded by this argument, CDW-G has failed to identify the specific entries it believes were spent on these

issues.  It does not explain at all how it arrived at 70 hours.  Such a vague objection deprives the fee petitioner of the opportunity to rebut the assertion, and it deprives the Court of the opportunity to provide the fee petitioner with the required clear and concise reason for a reduction.  *See Schlacher*, 574 F.3d at 857.  CDW-G could have easily attached an exhibit to its response that provided a basis for its requested reduction.  Without such a basis, the proposed reduction lacks specificity and must be denied.

> c.  *Objection: Excessive Hours Compensation for Repeatedly Bringing New Department of Justice ("DOJ") Attorneys Up to Speed on the Case, Due to Staff Turnover at DOJ Should be Excluded*

Again, CDW-G fails to provide sufficiently specific objection.  It just vaguely states that the requested hours were excessive.  Even if CDW-G had provided a specific objection, it would have likely been overruled.  Like it or not, False Claims Act litigation by its terms necessarily involves the DOJ.  Turnover in staff at the DOJ is not exactly a new phenomenon.  To the extent that the objections are based on face-to-face meetings versus some other, less costly means, CDW-G has failed to sufficiently identify the entries it specifically objects to.[4]

> d.  *Objection: Unreasonable Inefficiencies and Redundancies Created by Having Multiple Attorneys Working on the Same Tasks Should Be Excluded*

CDW-G cites *Schlacher* for the principle that district courts should scrutinize fee petitions for duplicative billing when multiple lawyers seek fees.  *See* Doc. 307 at 17 (citing *Schlacher*, 574 F.3d at 858-859).  The Court completely agrees.  However, CDW-G has again failed to accomplish its side of this task.  The full portion of *Schlacher* that CDW-G relies on provides as follows:

---

[4] Once again, perhaps a detailed evidentiary hearing at which CDW-G's own attorneys explain their own hours spent negotiating draft after draft of its own release from the government with DOJ attorney Kelly Hauser would be enlightening.

Second, the district court referred to factors permissible in reducing the billed time: it observed that this was an uncomplicated, low-stakes case that settled within three months of filing and without discovery. The court concluded that it was unreasonable to require the defendant to pay for the time that four attorneys had collectively put into the case because their work necessarily overlapped and one competent attorney would have sufficed. This conclusion was not an abuse of discretion. Though efficiency can sometimes be increased through collaboration, *see Tchemkou v. Mukasey*, 517 F.3d 506, 511-12 (7th Cir. 2008), overstaffing cases inefficiently is common, and district courts are therefore encouraged to scrutinize fee petitions for duplicative billing when multiple lawyers seek fees. *See Trimper v. City of Norfolk*, 58 F.3d 68, 76-77 (4th Cir. 1995); *Lipsett v. Blanco*, 975 F.2d 934, 938 (1st Cir. 1992) ("A trial court should ordinarily greet a claim that several lawyers were required to perform a single set of tasks with healthy skepticism."); *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1160 (7th Cir. 1989). Here, the district court appears to have done that. *The defendant submitted detailed objections to the hours billed, identifying precisely which entries were excessive or redundant.* The district judge expressly sustained those objections, thereby implicitly finding that it was reasonable to compensate the four attorneys collectively for only about twenty-three of the nearly forty hours of claimed work. When added to the undisputed paralegal fees and costs, the total came to $6,322.70, which the district court apparently rounded up to $6,500. *Although greater detailed findings in calculating the fee award might have been required in a higher-stakes case*, the district court arrived at a fee that was reasonable in relation to the difficulty and stakes of this case, *see Bankston v. Illinois*, 60 F.3d 1249, 1256 (7th Cir. 1995), and provided an explanation that was "limited but sufficient" to enable us to determine that it did not abuse its discretion, *see Small*, 264 F.3d at 709; *Uphoff*, 176 F.3d at 409.

*Schlacher*, 574 F.3d at 858-59 (emphasis added). Unlike the respondent in *Schlacher*, CDW-G has not attempted to precisely identify which entries of Liotine's billing statements are objectionable. Without the detailed objections, the Court cannot make the detailed findings it is required to make in this higher-stakes case. *See id*.

It is recognized that pages 18-19 of CDW-G's response contain several examples to illustrate the ultimate point that CDW-G is trying to make with regard to the meat-axe reduction that it has requested. However, the Court cannot make specific findings as to the examples given because, for example, it cannot determine how CDW-G arrived at 1,067 hours for document review, 174 hours to prepare the initial set of discovery requests, 308 hours preparing two-cross

17

motions for partial summary judgment, 922 related hours for depositions, 70 hours spent preparing a GSA timeline, etc.  If some of those totals are actually correct and CDW-G can specifically document how it arrived at those figures, a persuasive argument for specific reductions likely could have been made.

The Court does not understand why CDW-G obviously spent time carefully reviewing the billing statements to compile these totals, yet it failed to provide detailed objections that precisely identified the portions of the billing statements to which it objects.  This could be done without taking much space in its response by using exhibits to show how it arrived at its total.  Perhaps CDW-G chose the less-detailed approach in hopes that the Court would be so perplexed that it would ultimately adopt its meat-axe reduction approach.  CDW-G states that it does not ask the Court to engage in a line-item review of the hours spent by Liotine's counsel.  But in order to grant objections based on the examples in this section, it would basically have to re-do the work that CDW-G purports to have done in tallying the entries line by line without any sort of roadmap.  This would necessarily require a line-item review.

> e.  *526 Hours Billed by Senior Partners Keller, Helmer, and Martins Should Be Excluded*

CDW-G argues that all of the time requested by senior partners other than Aschemann and Rice should be excluded because Aschemann and Rice are fully capable False Claims Act practitioners, and the time billed by other senior partners was therefore unreasonable.  However, when you factor in the length of this case, the amount of time billed by senior partners other than Aschemann and Rice over the life of this case is not substantial.  *See* Docs. 312 at 5; 313-1 at 2-3.  CDW-G has not specifically identified how the work performed by Keller, Helmer, and Martins is unreasonable or duplicative.  The mere fact that other senior partners billed hours in this case cannot lead the Court to a conclusion that any time they billed was *per se* unreasonable.

18

*See Kurowski v. Krajewski*, 848 F.2d 767, 776 (7th Cir. 1988) (The use of two (or more) lawyers, which solvent clients commonly pay for because they believe extra help beneficial, may well reduce the total expenditures by taking advantage of the division of labor.).  Additionally, it is noted that Dickstein senior partners Jackson and Nadler both participated in most proceedings. Considering the considerable cost to the client, it can only be presumed that those attorneys believed multiple attorney participation was necessary in this case.

   *f. Specific Objections*

   CDW-G made the following specific objections to the billing statements:

>    *1) Attempting Secure Conference Rooms and Meeting Arrangements (4/30/04 (0.5 hours), 11/24/08 (0.5 hours));*

   The Court recognizes that the Aschemann exercised billing judgment and did not submit any non-attorney hours for reimbursement. *See* Doc. 302-1 at 2 ¶ 8.  While this is commendable, the Court still cannot justify billing purely clerical tasks at a senior partner rates. *See Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989).  That Court does not have a secretarial rate to reduce the entry to (and we cannot make one up) so it will sustain the objection with a complete reduction to zero and assume these costs are subsumed in the hourly rates of counsel.  Based on this objection, one hour will be reduced from the time that Dale Aschemann billed in this case.

>    *2) Arranging Flight Schedules and Travel Itineraries (9/15/04 (0.4 hours), 8/29/08 (0.25 hours), 12/3/08 (0.4 hours), 6/17/11 (4.45 hours));*

   These are also clerical tasks billed at the partner level.  The entry from 6/17/2011 is one example of an inappropriate block-billed entry.  Unlike most of the rest of Aschemann's block entries, this entry does not specify how much time was spent on each task in the block.  Because the Court cannot determine how much time was spent on each task listed in the block, a percentage reduction is appropriate.  There is one clerical task in the block and there are 5 total

tasks in the block.  Therefore, the Court will reduce this entry by 20%.  On this objection, 1.94 hours will be reduced from the time that Dale Aschemann billed in this case (0.4+0.25+0.4+0.89).

> 3) *Scanning, Photocopying, and Organizing Documents, Copying CD-ROMs, and Dealing with Technology Issues Like Computer Malfunctions (9/17/07 (3 hours), 7/2/08 (1.25 hours), 8/19/08 (5 hours), 9/30/09 (8 hours), 2/17/10 (1 hour), 6/28/10 (2 hours)).*

These are also clerical tasks billed at the partner level.  With respect to the block-billed entry dated 9/17/2007, the Court cannot discern how much time was spent on each task.  Because one task was clerical and the other was not, the Court will deduct 1.5 hours from Aschemann's total for that 3 hour entry.  On this objection, 16.75 hours will be reduced from the time that Dale Aschemann billed in this case (1.5+1.25+5+8+1).

> 4) *On 4/5/04, Aschemann and Keller Drove to Fairview Heights to Meet with AUSA's Office and Back. (6.25 total hours each);*

Although the Court is sympathetic to the opportunity cost of driving and waiting, it agrees with CDW-G that, travel and waiting time should not be billed at a senior partner rate in light the rates being recommended for the lodestar calculation.  Based on this objection, Aschemann and Keller shall receive hour reductions of 6.25 each.

> 5) *On 4/8/04, Mr. Aschemann Drove 6.1 Hours to Elgin to Meet with Client.*

Based on this objection, Aschemann shall receive an hour reduction of 6.1 hours.

> 6) *On 1/19/05, Mr. Aschemann has the Vague Entry "To Fairview Heights (100 miles), for Which he Charged 6.5 Hours;*

Based on this objection, Aschemann shall receive an hour reduction of 6.5 hours.

> 7) *On 3/30/05, Mr. Aschemann Drove 6 Hours to Meet with Client;*

Based on this objection, Aschemann shall receive an hour reduction of 6 hours.

20

8) *On 8/18/05, Mr. Aschemann Drove 6 hours to Chicago to Meet with Client and GSA Officials;*

Based on this objection, Aschemann shall receive an hour reduction of 6 hours.

*3.  Hour Adjustments*

Based on CDW-G's above objections, the Court will deduct 50.54 hours (1+1.94+16.75+6.25+6.1+6.5+6+6) from Dale Aschemann and 6.25 hours from Tim Keller. Additionally, after review of time records from March 12 to March 28, 2013 from the Helmer firm for this case, it will be recommended that 25.70 additional hours be awarded to Robert M. Rice, 9.35 additional hours be awarded to James B. Helmer, Jr., and 0.5 hours be awarded to both Paul B. Martins and Jennifer Lambert. *See* Doc. 313-1; 313-2.  The Helmer firm appears to have again exercised substantial billing judgment with this time submission. *See id*.  CDW-G will be afforded the opportunity to object to this new evidence if it chooses to file an objection to this portion of the Report and Recommendation.

*4.  Preliminary Lodestar Calculation*

**Helmer Firm**

| Name | Hours | Rate/Hour | Total |
|---|---|---|---|
| James B. Helmer, Jr. (Lead Partner) | 256.95 | $600.00 | $154,170 |
| Paul B. Martins (Senior Partner) | 78.60 | $525.00 | $41,265 |
| Robert M. Rice (Senior Partner) | 2,948.15 | $525.00 | $1,547,778.75 |
| James A. Tate (Associate) | 1.20 | $295.00 | $354.00 |
| Jennifer Lambert (Senior Associate) | 164.55 | $390.00 | $64,174.5 |
| Erin M. Campbell (Associate) | 17.80 | $380.00 | $6,764.00 |
| Jennifer P. Pomerantz (Paralegal) | 900.25 | $175.00 | $157,543.75 |
| William J. Diggs II (Paralegal) | 5.75 | $155.00 | $891.25 |
| Dayna Boatright (Paralegal) | 6.25 | $175.00 | $1,093.75 |
| | 4,379.5 | | **$1,974,035** |

**Aschemann Firm**

| Name | Hours | Rate/Hour | Total |
|------|-------|-----------|-------|
| Dale Aschemann (Senior Partner) | 2,579.56 | $525 | $1,354,269 |
| Tim Keller (Senior Partner) | 196.6 | $525 | $103,215 |
| Tyler Robinson (Associate) | 200.1 | $350 | $70,035 |
| | 2,976.26 | | **$1,527,519** |

*5. Adjustments to Preliminary Lodestar Calculation*

The Aschemann firm has requested a 15% upward adjustment based on the *Hensely* factors. "The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Hensley*, 461 U.S. at 430 n.3 (citation omitted). Liotine spends a few pages of his fee petition describing in detail his efforts in this litigation. *See* Doc. 302 at 8-10. The Court agrees that Liotine fought a difficult battle against a well-funded and highly-skilled opponent, and achieved a substantial result. However, the Court does not agree that is one of the "rare and exceptional circumstances" where an upward adjustment of the lodestar amount is necessary. *Perdue*, 130 S. Ct. at 1673 (internal quotations and citations omitted). It is being recommended that the Aschemann firm be awarded a substantial fee award. Thus, this would appear to be a situation where all of the relevant *Hensley* factors are "subsumed in the lodestar calculation." *Id*.

Conversely, CDW-G argues that a 15% downward adjustment to the lodestar amount is appropriate in this case due to Liotine's limited success. In determining the degree of success

obtained, the Court looks to "the difference between the judgment recovered and the recovery sought, the significance of the legal issues on which the plaintiff prevailed and, finally, the public purpose served by the litigation." *Connolly v. Nat'l Sch. Bus Serv., Inc*., 177 F.3d 593, 597 (7th Cir. 1999) (citing cases). "The standard is whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case." *Id*. (citing cases). CDW-G argues that Liotine's complaint sought $228 million and only recovered $7 million. However, this figure appears to be disputed. *See* Doc. 244 at 27 ($28 million). Regardless, CDW-G acknowledges that the Seventh Circuit has rejected this type of mechanical adjustment argument. *See id*. (...this Court has repeatedly rejected the contention that a district court should look to the percentage of the plaintiff's initial demand actually recovered through settlement or judgment and then mechanically reduce the attorney's fee award by a proportionate amount.). Next, it is argued that Liotine "lost" on 8 of the 11 claims at the summary judgment stage. However, the failure to prevail on summary judgment is not the same as "losing" on a claim. This case settled prior to trial so the Court cannot conclude that Liotine or the government lost in any respect. Factoring in the significance of the legal issues on which Liotine prevailed and the fact that the case also served a public purpose, the Court cannot agree that this case is one where a percentage downward adjustment based on limited success is appropriate.

Finally, CDW-G points to the requested lodestar amount to argue that "the amount of attorney fees sought (about $3.7 million) is 53% of the entire recovery in this case." Doc. 307 at 24. This is a common tag-line used in many of CDW-G's documents filed in this court. Presumably, this is intended to convince the Court that the Liotine's attorneys are asking for an unreasonable award. However, many of the cases cited in support of CDW-G's own positions are cases where the attorney fee award was actually many times larger than the relief rewarded.

That's because such proportionality arguments have been explicitly rejected by the Seventh Circuit. *See Connolly*, 177 F.3d at 597 (Nor has this Court ever held that an attorney's fee award is unreasonable simply because it exceeds by some multiple the amount recovered by the plaintiff, notwithstanding the concerns in *Riverside v. Rivera*, 477 U.S. 561, 584-586, 106 S.Ct. 2686, 91 L.Ed.2d 466 (Powell, J., concurring) and *Cole v. Wodziak*, 169 F.3d 486, 488 (7th Cir. 1999). *See, e.g., Estate of Borst v. O'Brien*, 979 F.2d 511, 517 (7th Cir. 1992) (attorneys' fee award 47 times plaintiff's recovery not unreasonable)).

Although the lodestar amount being recommended in this case is sizable, it is not unreasonable especially when the public purpose of the False Claims Act and its fee-shifting provisions are considered.  "The original False Claims Act was enacted in 1863 in order to strike back against the fraud of unscrupulous Civil War defense contractors." *Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1041 (8th Cir. 2002) (citing S.Rep. No. 99–345, at 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273).  "The Act contained a *qui tam* provision allowing private persons to sue as relators representing the government's interests, and it rewarded relators who prevailed in their suits with a bounty of half the damages and forfeitures they recovered for the government." *Id.*  "The 1986 amendments were an avowed attempt to reinvigorate the False Claims Act after a 1943 amendment and judicial decisions interpreting the 1943 amendment had emasculated the 1863 law." *Id.* at 1040-41.  In its brief, the Helmer firm recalls the legislative intent of the 1986 amendments, as stated by its sponsors, as follows:

> The law we vote on today is intended to encourage a working partnership between both the Government and the *qui tam* plaintiff.  The public will be well served by having more legal resources brought to bear against those who defraud the Government....  Even the United States Government is not without financial limitations.  It is not uncommon for Government attorneys to be overworked and underpaid given the demanding tasks and frequently overwhelming caseloads they maintain.  I do not say this to impugn the ability or character of Government attorneys, but only to reflect the harsh reality of today's funding limitations of

24

> Government activities in all areas which include the budgets of the Government's prosecuting agencies.  If the Government can pass a law that will increase the resources available to confront fraud against the Government without paying for it with taxpayer money, we are all better off.  This is precisely what this law is intended to do: deputize ready and able people who have knowledge of fraud against the Government to play an active and constructive role through their counsel to bring to justice those contractors who overcharge the Government.

Doc. 300 at 3 (citing 132 Cong. Rec. 29315, 29321-22 (October 7, 1986) (Remarks of Cong. Berman); S. Rep. No. 345 at 5266-67).  The sizable lodestar amount recommended here is consistent with the Congressional intent of the 1986 amendments to the False Claims Act. Liotine, in partnership with the federal government, has achieved a substantial result that resulted in recovery for the United States.  This type of recovery is rare. *See id*. at 2 (citing statistics demonstrating that recovery for the United States occurs in 9% or less of all non-intervened cases).  Congress mandated fee-shifting in False Claims Act cases. 31 U.S.C. §§ 3730(d), 3730(h).  The size of the lodestar amount recommended here should serve to 1) encourage other highly-skilled professionals to engage in False Claims Act litigation and 2) have a deterrent effect on persons or corporations intending to engage in fraud against the federal government.

6. *Costs and Expenses*

CDW-G does not object to the requests for recovery of costs and expenses submitted by Liotine in his (Docs. 299, 301) fee petitions. *See* Doc. 307 at 2 n.2.  Those costs and expenses amount to $38,688.77 for the Helmer firm and $72,675.52 for the Aschemann firm.

7. *Additional Costs and Expenses*

After review of the additional costs and expenses from March 12 to March 28, 2013 submitted by the Helmer firm for this case, it will be recommended that an additional $190.40 be awarded.  CDW-G will be afforded the opportunity to object to this new evidence if it chooses to file an objection to this portion of the Report and Recommendation.

**B.  Conclusion and Recommendation**

For the forgoing reasons, it is recommended that Liotine's (Docs. 299, 301) motions for attorney fees be granted as follows:

1) The law firm of Helmer, Martins, Rice and Pophamco, L.P.A. should be awarded a lodestar amount of $1,974,035 and costs and expenses of $38,879.17.

2) The law firm of Aschemann Keller, L.L.C. should be awarded a lodestar amount of $1,527,519 and costs and expenses of $72,675.52.

**SO ORDERED.**

**DATED: May 17, 2013.**

_s/ Philip M. Frazier_
PHILIP M. FRAZIER
UNITED STATES MAGISTRATE JUDGE